**James HULBERT, Plaintiff–Appellee, Cross–Appellant,**

v.

**Richard WILHELM et al., Defendants– Appellants, Cross–Appellees.**

Nos. 96–2417, 96–2537.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1996.

Decided July 7, 1997.

Norman D. Singleton, White, Welter & Schilling, Eau Claire, WI, Harry R. Hertel (argued), Hertel & Gibbs, Eau Claire, WI, for Plaintiff–Appellee, Cross–Appellant.

Joel L. Aberg (argued), Weld, Riley, Prenn & Ricci, Eau Claire, WI, for Defendants–Appellants, Cross–Appellees.

Before RIPPLE, MANION, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

■ In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court held that public employees do not relinquish all rights to free speech under the First Amendment, even when that speech relates to their employment. Instead, a public employee's speech is constitutionally protected if it would be protected if uttered by a private citizen, it relates to a matter of public concern, and the public employer has not shown a convincing reason for forbidding the speech. See *Brown v. Disciplinary Committee of Edgerton,* 97 F.3d 969, 972 (7th Cir.1996); *Dishnow v. School District of Rib Lake,* 77 F.3d 194, 197 (7th Cir.1996). In this case, James Hulbert won a verdict after a jury trial on his claim that Pierce County, Wisconsin, and a number of its officials violated his First Amendment rights when it retaliated against him for voicing his concerns about certain county practices. We conclude that the district court correctly refused to set aside the jury's verdict on the county defendants' post-verdict motion for judgment as a matter of law, that it correctly refused to find that the individual defendants enjoyed qualified immunity in these circumstances, and finally that the court correctly decided that the issue of punitive damages should not be submitted to the jury. We therefore affirm the district court's judgment in its entirety.

## I

■ As the defendants make no complaint about evidentiary rulings or jury instructions, we view the facts here in the light most favorable to the jury's verdict. See *Frazell v. Flanigan,* 102 F.3d 877, 882 (7th Cir.1996). Hulbert began working for Pierce County, Wisconsin, in November 1988 as a zoning administrator. In May 1989 he became the administrator of the land management department, and he assumed additional duties as administrator for the solid waste department. Hulbert enjoyed his job, felt that he performed it well, and was vindicated in that opinion by the grades of 1's and 2's (corresponding to "distinguished" and "commendable") that he received in his May 1991 evaluation. Things turned sour for him in early 1992, after he observed a large open fire burning potentially toxic materials behind the Pierce County highway department shop on February 20th of that year. Hulbert had cautioned the highway department in the past against the illegal, open burning of such materials, and he was disturbed to find the fire.

He immediately informed Marge Baldwin, then the chair of the solid waste management board, of the burning incident. She authorized him to report it to the Wisconsin Department of Natural Resources (DNR), which he did on the next day. Repercussions for him began almost immediately, when corporation counsel Deb Wojtowski asked Hulbert if he was trying to embarrass the county and told him that "Pierce County does not protect whistleblowers." Land management committee chair Joe Rohl (one of the defendants here) also reprimanded him verbally. In spite of these problems with the higher county management, after the open fire incident Hulbert and an assistant highway commissioner successfully worked together on a coordinated waste management policy for the highway department and the solid waste management department. As a result, the working relationship between those two departments improved.

The second negative incident between Hulbert and the county board arose over certain billing practices followed by the county surveyor. The surveyor's office had been supervised by Hulbert's land management department since 1991. The county used private surveying contractors, rather than having its own full-time surveyor. Hulbert believed that this was a bad idea, because he thought it created a potential conflict of interest and it led to a lack of accountability in the surveyor's office. In June 1992, the land management department received a check for $2,059.43 made out to the Pierce County Surveyor, accompanied by a surveying bill that had not been sent by the department. Hulbert recognized that this method of billing and payment deviated from official procedures, and he suspected that it represented improper activity.

On June 30, 1992, he voiced these concerns in a memorandum to the land management

committee of the County Board. At the time, he did not personally confront the surveyor, Robert Sheffers, about the bill or his memo. The committee met on July 8, 1992, to discuss Hulbert's memo, and on July 23, 1992, committee vice-chair George Petaja authorized Hulbert to tell corporation counsel Wojtowski about his concerns relating to the surveyor's office and its billing practices. Hulbert did so and requested a legal opinion on the billing issue. Wojtowski accordingly conducted an investigation of the office and issued a written opinion on August 31, 1992, in which she raised general administrative concerns related to the payment, but also stated that the payment was not improper.

Meanwhile, Hulbert wrote a letter to the entire Pierce County Board on August 20, 1992, in which he analyzed the county surveyor situation and suggested that the upcoming September 2 closed session of the land management committee would be a good opportunity to review the matter. The committee, which included defendant County Board members Richard Wilhelm (chair of the County Board), Rohl, Ray Anderson, and Richard Truax, did take up the subject at the September 2 meeting, but the meeting was open, not closed, because Wojtowski had ordered it to be open. She distributed a memo to the committee members detailing the bills from the surveyor's office and the payments Sheffers had received. Things turned ugly during the open meeting when Sheffers angrily asked Hulbert if Hulbert was accusing him of "pocketing the money." Hulbert said that he was not.

After that meeting, matters turned worse for Hulbert. First, Sheffers appeared before the personnel committee of the County Board, which included most of the same people as were on the land management committee: Wilhelm, Truax, Anderson, Steve Schoeder, and John Berggren. (The same five men made up the executive committee of the Board during Hulbert's remaining tenure with the county.) Sheffers complained to the personnel committee that Hulbert had slandered him at the September 2 meeting and that he was considering suing. After this incident, however, the working relationship between Hulbert and Sheffers improved (or

so the jury could have believed from the conflicting accounts it heard).

Even if Sheffers was willing to forgive and forget, the County Board was not. On March 17, 1993, the personnel committee sent Hulbert a letter of reprimand, which said in part:

As a result of an investigation authorized by this Committee, a concern has been raised about your judgment as a Department manager. Specifically, the Personnel Committee's concern is centered upon your action which instigated an inquiry by the corporation counsel's office into the contractual relationship between Pierce County and Bob Sheffers, the County surveyor. It is our understanding that you personally made a verbal request to the corporation counsel's office for an investigation of the County surveyor when certain bank checks were received by your office for survey work performed by Mr. Sheffers.

The letter also stated that the personnel committee had concluded that Hulbert had not discussed the billing issue with Sheffers or received authorization from the land management committee before contacting Wojtowski. "When in doubt, talk to your supervising committee," the letter advised. It was signed by Wilhelm and the other four members of the personnel committee, with a copy to Rohl. Rohl knew that Hulbert had obtained permission from Petaja before he contacted the corporation counsel, but Rohl did not tell the personnel committee about its error.

From Hulbert's perspective, this letter was a bolt out of the blue. Ordinarily, any disciplinary actions against an employee were initiated by a grievance filed with the alleged offender's department head by the employee who believed he was wronged. If that did not resolve matters, the employees and the chair of the supervising committee were to appear before the personnel committee for arbitration. No one ever told Hulbert about these procedures, which were not followed in his case.

Hulbert was devastated by the letter. He wrote to Wilhelm on April 4, 1993, informing him that the personnel committee's assump-

tion that he had not been authorized to contact Wojtowski was wrong, because he had in fact obtained permission from his supervising committee's vice chair to do so. The personnel committee was unmoved. It wrote back that the reprimand would remain in his file unless he provided information "which would substantially alter the Committee's view of [his] action as a department head." Hulbert did not write back. He did, however, report the reprimand letter to the land management committee, as he was required to do by County personnel policy. The land management committee did not discipline him.

On August 25, 1993, Wilhelm notified Hulbert that under a new management study his job classification had been fixed as a Grade 11, Step 3, based on his 1989 job description. The 1989 description, while perhaps accurate at the time, did not reflect the expanded responsibilities Hulbert had assumed over the years. Recognizing this, the land management committee had unanimously approved a more accurate job description for Hulbert for the purpose of determining his new job classification, but the personnel committee disregarded its recommendation. The Grade 11, Step 3 classification carried with it a salary that was $3,681 lower than Hulbert's actual salary. Wilhelm's letter advised Hulbert that his salary would therefore be frozen at its current amount until the personnel committee took some action.

The last blows to Hulbert came in the form of his performance evaluations. His November 1993 evaluation, compiled by Rohl with independent input from the other members of the land management committee, showed a marked decrease in ratings compared with his 1991 evaluation (Hulbert's 1992 evaluation also reflected a lower rating, in part due to the highway department fire incident). In the 1993 evaluation, Rohl gave Hulbert no 1's at all, a few 2's, and many grades between 2 and 3. Furthermore, the form contained for the first time comments like "Work on improving working relations between departments" and "Needs to change attitude towards supervision & County Govt."

As matters deteriorated on the job, Hulbert began to suffer both emotionally and physically. Toward the end of 1992, he began to lose weight and to experience insomnia. His family and coworkers noticed the change in him. Through 1993 and 1994, his condition worsened. He experienced a variety of stress-related symptoms, including aches, pains, headaches, hives, fatigue, insomnia, and loss of appetite. He saw a doctor in the fall of 1994, thinking that he might have Lyme disease. The doctor found nothing physically wrong with him and referred him to a psychologist.

The October 1994 performance evaluation was even worse than the November 1993 evaluation. Wilhelm, who had since joined the solid waste management board, compiled the evaluation and gave Hulbert several scores between 3 and 4. To make matters worse, Hulbert's 1994 cost-of-living adjustment was also unexpectedly low. Although most other county employees received a 3.25% increase that year, Hulbert received only a 1.5% increase. This was the first time he had not received the same cost-of-living increase as the other employees, and was evidently the last straw for him. In October 1994, he began seeking other employment. On December 29, 1994, he tendered his resignation and began working as coordinator of ecological affairs for Aveda Corporation in January 1995. Since beginning his new job, the physical and emotional problems he experienced have gone away.

Just before he left county employment, Hulbert filed this suit under 42 U.S.C. § 1983 against Pierce County and against Wilhelm, Truax, Schoeder, Anderson, Berggren, and Rohl in both their individual and respective official capacities, alleging that they had violated his First Amendment rights. The district court tried the liability phase of the claim to a jury from August 16 to 18, 1995, and upon the jury's verdict for Hulbert, it tried the damages phase to the jury on August 24, 1995. The jury awarded compensatory damages of $100,000, but the district court refused to submit the issue of punitive damages to it. The court later denied defendants' motions for judgment as a matter of law or for a new trial (including a request for a remittitur reducing the damages award to an amount of $10,000 or less). The defendants appealed, and Hulbert filed a

cross-appeal on the court's refusal to instruct the jury on punitive damages.

## II

The Pierce County defendants present four issues on appeal. First, they claim that Hulbert failed to show a violation of his First Amendment rights; second, they argue that the individual defendants were entitled to qualified immunity from suit; third, the County asserts that Hulbert did not show that it had a custom, policy, or practice of retaliating against employees for their exercise of free speech rights; and finally, they argue that Hulbert was not entitled to damages, or at least not to the full $100,000 the jury awarded. Our review of the first three claims is *de novo*, while our review of the last is only for abuse of discretion by the trial court.

■ Both parties agree that the principal issue on the first point is whether Hulbert's speech was constitutionally protected under the line of Supreme Court decisions beginning with *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and including *Connick v. Myers, supra*, and *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). To be protected, as Justice O'Connor's opinion for the plurality in *Waters* put it, "the speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 511 U.S. at 668, 114 S.Ct. at 1884 (internal quotations and citations omitted). This court elaborated on that standard in *Brown* and *Dishnow*, where it held that public employee speech is protected if (1) it would be protected if uttered by a private citizen, (2) it concerns something more than a personal employee grievance, and (3) the employer has not shown a convincing reason to forbid the speech. See *Brown*, 97 F.3d at 972; *Dishnow*, 77 F.3d at 197.

■ We must first identify the protected speech at issue, before we can consider it under the governing law. Hulbert relies on two general incidents: his report of the highway department's February 20, 1992, fire to the Wisconsin DNR, and his request that the corporation counsel investigate the surveyor's billing practices and the consequent public statements he made about that matter. The jury found that defendants Wilhelm, Schoeder, and Rohl took the actions they did against Hulbert because of his report about the highway department fire and that they would not have taken those actions had it not been for this report. It also found that all six individual defendants took adverse job actions against Hulbert that went beyond the March 17, 1993, letter of reprimand, and that the defendants took those actions because of Hulbert's reports and public statements about the surveyor's office.

The first question we must answer is whether Hulbert's speech on both those occasions would have been protected if uttered by a private citizen. The answer in each case is yes. If a private citizen had been driving by and had observed a large, open fire near the Wisconsin highway department, and, suspecting possible toxic fumes, had reported that fire to the Wisconsin DNR, there is no question that the report would have been protected speech. (We live in a world where it is illegal in most urban areas even to burn leaves in autumn, much less to have a large open fire for more complex substances; thus, the hypothesis that a private report may have been made is hardly fanciful.) Similarly, if a private citizen investigating the County's financial records (which are open to public inspection under Wisconsin law, see Wis. Stat. § 59.20(3)) had come across questionable billing practices on the part of the county surveyor, that citizen could certainly have publicized her concerns in any way she saw fit. Billing irregularities of public bodies affect all taxpayers and are an all-too-frequent subject of media exposés.

■ By the same token, Hulbert's speech went well beyond the kind of personal employee grievances we have found in other cases not to warrant First Amendment protection. See *Smith v. Fruin*, 28 F.3d 646, 653 (7th Cir.1994) (plaintiff's speech on his personal concerns about second-hand smoke

in the office was not speech on a matter of public concern); *Swank v. Smart*, 898 F.2d 1247, 1250–51 (7th Cir.1990) (private chat between plaintiff and associate was not speech on a matter of public concern). The fact that Hulbert brought his concerns to the County's attention through the use of internal memoranda and telephone calls does not deprive him of the protections of the First Amendment. See *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 413, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979). We find it hard in any event to believe that the county would have preferred his going immediately to the local newspapers and television stations with his information. Hulbert is, if anything, to be commended for attempting to go through the County's established internal channels, which appeared to have worked successfully in the case of the fire incident, and (from Hulbert's perspective) somewhat less so with respect to the surveyor's office.

Last, the Pierce County defendants did not offer a convincing reason to forbid Hulbert's speech. It would be odd, to say the least, to forbid the administrator of the land management department to report suspected environmental problems to the state DNR, particularly if that person was specifically authorized to do so by the chair of the solid waste management board. Baldwin's authorization is proof enough that the County had no reason to muzzle Hulbert. The same is true again of his effort to investigate the surveyor's office billing practices. His initial memo went only to Rohl, as chair of his supervisory committee, and Petaja, the vice-chair. The full committee discussed the memo a week later, and Petaja then authorized Hulbert to contact the corporation counsel. This led to the meeting that was open at corporation counsel's instructions, where the alleged slander occurred. The County's actions speak for themselves here. Far from having a convincing reason to forbid Hulbert's initial report and his remarks at the meeting, the responsible officials took the matter seriously enough to follow up on it for several months. The County's after-the-fact effort to justify its actions in the name of "maintaining harmonious relations between its employees" is not enough to overcome the objective indicia pointing to its

lack of a sufficiently compelling countervailing interest here.

■■ In order to prevail under § 1983, Hulbert also had to show that the County and the individual defendants unconstitutionally deprived him of his First Amendment rights, that they intentionally caused this deprivation, and that they acted under color of state law. See *Gregorich v. Lund*, 54 F.3d 410, 413 (7th Cir.1995) (government liability only where act committed under color of state law); *Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir.1988) (discussing need to show intent to retaliate). The "under color of state law" element is uncontested, but the County defendants continue to argue that they took no actions to deprive Hulbert of his rights, intentionally or otherwise. They adopt a "divide and conquer" strategy to argue that none of the adverse job actions on which Hulbert relies amounted to a deprivation. With respect to the 1993 evaluation, which was lower than Hulbert's 1992 evaluation but higher than the 1994 evaluation, the defendants rely heavily on Hulbert's admission that it was accurate and "good." They have little to say about the disastrous 1994 evaluation other than that they "fail to see how [it] infringe[d] upon any protected right [Hulbert] might have." They dispose of the cost-of-living increase disparity by noting that the County Board was free to accept, reject, or modify any recommendation the individual defendants made in their capacity as personnel committee, and they argue that the letter of reprimand should not have been considered because it was based on the (admittedly erroneous) assumption that Hulbert initiated an investigation of the County surveyor without a resolution from his supervising committee.

All of these arguments may have been fine to present to the jury, but the defendants' basic problem is that the jury rejected them. It found that Rohl took action resulting in Hulbert's receiving an *adverse* job performance evaluation in 1993; had the jury believed overall that the 1993 evaluation was not adverse, it would have answered "no" to that question. The jury also found that Wilhelm took action resulting in Hulbert's receiving a negative job performance evalua-

tion in 1994, while it exonerated Schoeder of that charge. Finally, the jury found that all five individual defendants took "action resulting in plaintiff's receiving a pay raise that was less than those given to comparably situated Pierce County employees." It is worth bearing in mind, in this connection, that the personnel committee was identical to the county's executive committee, and that both were chaired by Wilhelm, the County Board chair. The evidence we have rehearsed above easily supports the jury's conclusions on these matters. The issues presented to the jury did not ask separately about the letter of reprimand (an omission the court explained in its order denying postverdict relief), but the jury could have concluded that the continued presence of the letter in Hulbert's file after he made it clear that his actions had been authorized by his supervising committee contributed to his negative job evaluations. Overall, the evidence supports the jury's conclusion that all of the defendants intentionally retaliated against Hulbert through the pay raise action, and that some of them retaliated further in the job performance evaluations.

■ This conclusion means that we must reach the individual defendants' claim of qualified immunity. They argue that no clearly analogous case law would have alerted them to the unconstitutionality of their actions and that they believed they were acting reasonably under the circumstances facing them. The latter argument misstates the relevant inquiry. As we held in *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir.1996), "[t]he [qualified immunity] inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." The Supreme Court explained in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), that the objective legal reasonableness standard requires some specificity in identifying the pertinent legal rule:

> the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a rea-

sonable official would understand that what he is doing violates that right.

483 U.S. at 640, 107 S.Ct. at 3039.

■ Here, the question is whether a reasonable public official should have known that he or she could not retaliate against a subordinate employee for reporting an environmental problem to the state DNR or for initiating an investigation of a public office's billing practices, which was then authorized by his supervisory committee and taken up by the corporation counsel. While it is true that the *Pickering/Connick* standard requires case-by-case application, we think in light of both those decisions (which pre-dated the events here by a considerable measure) no reasonable official could have thought these actions justified. Also see *Knapp v. Whitaker*, 757 F.2d 827, 843–44 (7th Cir. 1985) (upholding a jury finding of First Amendment retaliation where employer, in response to protected speech, gave plaintiff negative evaluations and transferred him to a different school); *McGill v. Board of Educ.*, 602 F.2d 774, 780 (7th Cir.1979) (discussing retaliatory job transfers). *Connick* reiterated *Pickering*'s rule that the mere incantation of the phrase "internal harmony in the workplace" is not enough to carry the day, and the Pierce County defendants appeared to have relied on nothing more substantial than that. The casualness with which they took their adverse actions against Hulbert reinforces the unreasonableness of their actions. They sent Hulbert a reprimand letter based solely on Sheffers' accusations, not even bothering to ask the board member who chaired his supervisory committee whether the investigation had been pre-authorized. When informed of what really happened, they refused to remove the letter from Hulbert's file, and their increasingly negative performance evaluations were based more in venting lingering animosity from their confrontations with Hulbert than in providing constructive criticism. We agree with the district court that the individual defendants were not entitled to qualified immunity.

Last, the County argues that it can be liable only where the constitutional injury is caused by a municipal policy, custom, or practice. See *Board of County Commission-*

ers of *Bryan County v. Brown,* — U.S. ——, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Monell v. Dept. of Social Servs. of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Bryan County,* the Supreme Court sought to clarify the proper standard for municipal liability. Rejecting the notion that a plaintiff could succeed by simply identifying conduct attributable to the municipality, the Court held that "[t]he plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bryan County,* — U.S. at ——, 117 S.Ct. at 1388. The Court also noted that plaintiffs could satisfy this burden with proof that the deprivation of the federally protected right was intentionally caused by the "municipality's legislative body or authorized decisionmaker." *Id.* at ——, 117 S.Ct. at 1389.

Here, the actions were taken by the municipal policymaker, in the form of the County Board itself. The question of who is a municipal policymaker is determined by state law. In Wisconsin, the relevant law states that:

> (1) The powers of a county as a body corporate can only be exercised by the board, or in pursuance of a resolution adopted or ordinance enacted by the board.
>
> (2) Ordinances may be enacted and resolutions may be adopted by a majority vote of a quorum or by such larger vote as may be required by law.

Wis. Stat. § 59.02. Under this law, County corporation may exercise its powers either through the county board or by others acting under a resolution or ordinance of the board. Pierce County concedes that the members of the personnel committee (all board members) acted as a final decisionmaker with respect to the negative actions taken towards Hulbert, but it argues that the committee was not acting in accordance with an official policy or an express delegation of authority from the full board.

■■■ This case is a far cry from *Bryan County,* where the plaintiffs were trying to hold the county liable on the theory that the county had hired an employee without conducting a full background check, thus mak-

ing the county liable for that employee's use of excessive force. It is not even like *Radic v. Chicago Transit Auth.,* 73 F.3d 159 (7th Cir.1996), where executive personnel acting for the Chicago Transit Authority were not municipal policymakers within the meaning of this line of cases. With five members of the County Board sitting on the personnel committee, Hulbert was before the highest municipal policymaker he could reach. Not surprisingly, the full board ratified the personnel committee's actions by adopting its recommendations. This meant that the County Board itself adopted the recommendation that Hulbert should be placed in Grade 11, Step 3, with a frozen salary. Based on these facts, the jury found that Pierce County took adverse job actions against Hulbert because of his public statements. Its finding was supported by the evidence and consistent with the law on municipal liability as recently explained by the Supreme Court.

■■■ Last, the defendants attack the jury's award of $100,000 in compensatory damages. While this may seem on the high side for a compensatory award, we are mindful of the wide discretion the district court enjoys when it considers a motion for a new trial on damages and a motion for a remittitur. See *Medcom Holding Co. v. Baxter Travenol Laboratories,* 106 F.3d 1388, 1397 (7th Cir.1997) (motion for new trial on damages); *Miksis v. Howard,* 106 F.3d 754, 764 (7th Cir.1997) (motion for new trial on damages and remittitur). Under that standard of review, we cannot say that the district court abused its discretion when it chose to let the jury's verdict stand. Hulbert suffered both on the job and at home, physically and mentally, from September 1992 until he resigned at the end of 1994. His family and co-workers were concerned about him, and he sought professional help with both his physical and mental problems. The district court reviewed the evidence in its order denying the new trial and remittitur, and we are not inclined to second-guess its evaluation.

### III

■■■ For similar reasons, we see no error in the district court's decision not to instruct

the jury on punitive damages, which is the subject of Hulbert's cross-appeal. Hulbert argues that the record would support a finding that the defendants acted with callous disregard for his rights. The district court knew this was the legal standard, but concluded that the evidence was insufficient to permit the jury to find reckless or callous disregard. The defendants add that Hulbert violated Fed. R.App. P. 28(a)(4) and 28(h) by failing to include any references to the record in the argument section of his cross-appeal.

This court has no obligation to comb through the record to find the evidence that the district court has already told us is missing. See *Tyler v. Runyon,* 70 F.3d 458, 466 (7th Cir.1995) ("arguments not supported by pertinent authority or reference to the record are waived on appeal"). Even taking into account the facts to which Hulbert alludes in his brief, we do not see evidentiary support for escalating this action into one for punitive damages as well.

We therefore AFFIRM the judgment of the district court in its entirety. Pursuant to Fed. R.App. P. 39, costs are to be borne by the appellants.