Ada CARLISLE, Plaintiff,

v.

Richard LOPRESTI, Lieutenant Cook County Sheriff and Thomas Walsh, Assistant Chief Cook County Sheriff, Defendants.

No. 97 C 4882.

United States District Court, N.D. Illinois, Eastern Division.

April 30, 1999.

Matthew Litvak, Chicago, IL, for Plaintiff.

Kevin Thomas Noonan, Margaret Moira Smith, Cook County States's Attorneys, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

The plaintiff, Ada Carlisle, sued the defendants, Cook County Sheriff Assistant Chief Thomas Walsh[1] and Cook County Sheriff Lieutenant Richard Lopresti under 42 U.S.C. § 1983. Carlisle, who is African American, alleges that Walsh and Lopresti violated her First Amendment rights by retaliating against her for complaining of an allegedly discriminatory assignment practice at the Cook County Sheriff's Office. Currently before the Court is Defendants' motion for summary judgment. For the reasons stated below, the motion is denied.

## I. RELEVANT FACTS[2]

From 1985 to the spring of 1996, Carlisle worked as a Deputy Sheriff at the Harrison and Kedzie courthouse (the "Kedzie courthouse") (in Chicago. (12(M)(3) at 1.) Carlisle's direct superior at the courthouse was Lopresti, who, in turn, was supervised by Walsh. (12(M)(3) Ex. B

---

**1.** Walsh passed away since this lawsuit was filed.

**2.** The following facts are gleaned from the parties' respective Local General Rule 12 statements of material facts and accompanying exhibits. Walsh and Lopresti raised nu-

at 18; 12(M)(3) at 4.) One of Lopresti's weekly responsibilities was assigning deputies to each of the following posts at the Kedzie courthouse: 1) courtroom security for Branch 43, the misdemeanor courtroom; 2) courtroom security for Branch 44, the felony courtroom; and 3) front door security at the civilian entrance. (12(M)(3) at 6–8.)

In September 1995, an African–American judge (the "Judge") was assigned to Branch 43. (12(M)(3) at 5; 12(N)(3)(b) at 1.) Shortly after her arrival, the deputies began complaining about the Judge's demeanor and slowness, which resulted in extended working hours. (12(M)(3) at 8–10.) Carlisle denies complaining about the Judge and says she had no preference for working with any particular judge. (12(M)(3) at 8.)

In November 1995, Cook County Chief Sheriff Carick informed Walsh and Lopresti that the Judge had requested that deputies Charles Tate and Charles Harp, both of whom are African American, be assigned to her courtroom. (12(M)(3) at 5, 10; 12(M)(3) Ex. B, at 32–33.) As a result, Lopresti stopped his previous practice of rotating deputies among the three posts and primarily assigned Tate, Harp, and Carlisle to work with the Judge in Branch 43. It is unclear why Carlisle was assigned to Branch 43 along with Tate and Harp, (see 12(M)(3) Ex. B at 33), but she perceived the permanent assignments to be racially discriminatory. (12(M)(3) at 11.)

On November 27, 1995, Carlisle wrote a memorandum to Walsh stating:

> Male and Female deputies are rotated weekly from court to court to security, but for the past three ... weeks myself, ... Harp and ... Tate have remain[ed]

---

merous objections in their response to Carlisle's 12(N)(3)(b) Statement of Additional Facts; the objections to ¶¶ 10–16 in regard to the unsworn "Mayfield Affidavit" are sustained, but all other objections to the facts listed herein are overruled.

in Br[anch] # 43 and not rotated to other courts. On several occasion[s] the white officers have complain[ed] about working in [the Judge's] court[ ]room.... [the Judge] is [African American], none of the white officers have been assigned to [the Judge's] courtroom for the past [three] weeks[—]only [African American] officers have been assigned there[.] I asked [Lopresti] why I was not being rotated like the white officers and he ... [told] me he was following orders from Deputy Sheriff Patrick Hecker. I would like to know why I am not being rotated like the white officers.

(12(N)(3)(b) Ex. F.) After writing this memorandum, and while Carlisle, Harp, and Tate remained assigned primarily to Branch 43, Carlisle states that she confronted Walsh on at least two occasions regarding the matter. On the first occasion, Carlisle claims that she told Walsh that she felt he and Lopresti were discriminating against the African–American sheriffs. (12(N)(3)(b) at 2.) Walsh allegedly replied, "That's the way you look at it but that's the way it's going to be." (12(N)(3)(b) at 2.) Carlisle later told Walsh and Lopresti that, "We are in the courtroom by oursel[ves]. Most times we ... don't get a break. They wouldn't send the white sheriffs in to give us a break. They wouldn't even come into the courtroom." (12(N)(3)(b) at 2; 12(M)(3) Ex. A at 63.) Walsh testified that he may have discussed Carlisle's allegations with Lopresti, but no internal investigation was conducted and, in the end, he decided not to change the assignments.[3] (12(M)(3) Ex. C, at 39–40.)

On January 18, 1996, Carlisle filed a written charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), (12(M)(3) at 2), alleging

that the courtroom assignments had been segregated since November 1995. (See 12(N)(3)(b) Ex. F.) Although Lopresti recalls receiving a telephone call from a woman investigating the charge, possibly Ms. Gloria Mayfield ("Mayfield"), (see 12(N)(3)(b) at 27–33), the record does not definitively reveal when he and Walsh first learned of Carlisle's EEOC charge.[4]

In January 1996, the Judge was transferred from the courthouse and Lopresti resumed rotation of the post assignments. (12(M)(3) at 5, 10.) In July 1996, Carlisle says that Mayfield called and informed her that an attorney for the Cook County Sheriff wanted to offer an apology for Walsh's and Lopresti's conduct, and a promise that the conduct would not be repeated. (12(N)(3)(b) Ex. F at 1.) Carlisle says she rejected the offered apology. (12(N)(3)(b) Ex. F at 1.) Sometime that month, Carlisle was suspended for three days without pay, causing her to lose approximately $345.00 in wages. (12(M)(3) at 14–15.) In addition, three days after she says she rejected the offered apology, Carlisle received written notification that she was being transferred from the Kedzie courthouse to a court located at 1340 S. Michigan Avenue in Chicago ("Michigan Ave. courthouse"). (12(N)(3)(b) at 2.) The Michigan Ave. courthouse is three or four miles farther away from Carlisle's house than the Kedzie courthouse, making it inconvenient for her to get to work. (12(M)(3) at 15.) Carlisle worked at the Michigan Ave. courthouse for three months before her request to return to the Kedzie courthouse was granted. (Id. at 14.)

The parties dispute the reasons why Carlisle was suspended and transferred. Carlisle asserts that Walsh and Lopresti

3. Walsh testified that "as long as [the courthouse] was running fine, and [the Judge] was happy, I was happy." He also said that there was no internal investigation about Carlisle's allegations because, "everything was happy." (12(M)(3) Ex. C at 39–40.)

4. During his deposition, Lopresti was asked when he became aware of the EEOC investigation; his response, however, was not supplied to the Court. (12(M)(3) Ex. B at 25.) There is no mention of the EEOC charge in the portions of Walsh's deposition supplied to the Court.

were retaliating against her for her complaints to them and to the EEOC about the assignment practice. In support of her position, Carlisle relies upon the close temporal connection between her refusal to accept the Sheriff's Office's apology and her suspension and transfer. (12(N)(3)(b) at 2.) She also points to Lopresti's testimony that, for the most part, a deputy is only detailed from one location to another when that deputy is "having a problem working at that facility." While Carlisle denies Lopresti's charge, Lopresti documented Carlisle's shortcomings in a July 3, 1996 memorandum to Walsh recommending that Carlisle be temporarily transferred.[5] (12(N)(3)(b) at 5.) As the basis for Carlisle's transfer, Walsh and Lopresti argue that Carlisle was often tardy to work, she was the cause of several written complaints, and others believed her to have poor work habits in general. (12(M)(3) at 12–13; 12(M)(3) Ex. I–J; 12(N)(3)(b) Ex. E.) However, of Carlisle's 46 incidents of tardiness between January 1991, and April 1996, she was late by 15 or fewer minutes in 25; also, only one incident occurred in 1996, and only six occurred in 1995.

(12(M)(3) at 12–13; 12(M)(3) Ex. I). A deputy can be up to 15 minutes late to work without being considered tardy unless it is a chronic problem; and, although Lopresti characterized Carlisle as being habitually tardy, he never filed a separate written complaint or counseled her about that conduct. (12(N)(3)(b) at 3.) Additionally, of Carlisle's ten behavioral incidents between September 1993, and July 1996, three occurred in 1996 and one occurred in 1995. (12(M)(3) at 13; 12(M)(3) Ex. J.).

More significantly, Lopresti's memorandum revealed that Carlisle's transfer was motivated, at least in part, by her complaints. (12(N)(3)(b) Ex. E at 1.) Lopresti wrote: "[Carlisle] is currently in a grievance against R/LT. regarding false accusations of improper disciplinary procedure and racism, which accusations she has also used in the past" as part of his basis for concluding that she should be temporarily detailed to another courthouse. (12(N)(3)(b) Ex. E at 1.) Carlisle testified that when she asked Walsh and Lopresti why she was being suspended and transferred, both responded that they did not

**5.** The full text of Lopresti's memorandum read as follows:

> After observing D.S. Carlisle for the last nine months, and after studying her file, R/LT. has come to the conclusion that D.S. Carlisle's performance and her relationship with her supervisors and fellow deputies has come to an impasse at Police Courts North. R/LT. has come to the conclusion that it would be in the best interests of the Sheriff's Dept. as well as D.S. Carlisle for her to be temporarily detailed to another facility. This would afford her an opportunity to re-evaluate [sic] her status at Police Courts North objectively, and decide if it is best for her to continue her career there. The following are reasons why R/LT. has come to this conclusion:
> 1. D.S. Carlisle is not motivated to perform. She shares very little of the work load.
> 2. She is frequently having confrontations with other deputies.
> 3. The other deputies are frequently complaining about her performance to supervision.
> 4. She has confrontations with supervision, and refuses to accept disciplinary

> action. This has occured [sic] over the course of several years and 5 consecutive supervisors. She is currently in a grievance against R/LT. regarding false accusation of improper disciplinary procedure and racism, which accusations she has also used in the past. R/LT. has discovered 17 examples of confrontation and refusal in D.S. Carlisle's file.
> 5. These problems seem to be unique to her tour of duty at Police Courts North. D.S. Carlisle has been a deputy for 17 years. There is very little in her file previous to her assignment here. She has been under several chiefs and supervisors here, yet these problems persist.
> 6. She is constantly late. There is [sic] a plethora of tardy slips in her file.
> 7. D.S. Carlisle refuses to acknowledge her problems.
> In conclusion, R/LT. hopes that a temporary change of assignment will help D.S. Carlisle improve, as opposed to a detrimental pattern of progressive discipline.
> (12(N)(3)(b) Ex. E.)

know—despite the existence of Lopresti's memorandum. (12(M)(3) Ex. A at 118–119.)

As for Carlisle's suspension, Walsh and Lopresti deny that her complaints played any role in her suspension, explaining that Carlisle was suspended because of an argument between her and Lopresti in April 1996. (12(M)(3) at 14.) Following the argument, Lopresti filed a Summary Punishment Action Request ("SPAR") against Carlisle, claiming that she violated Sheriff's Office rules and recommending a three-day suspension without pay. (12(M)(3) at 14–15; 12(M)(3) Ex. J at 27–28.) Carlisle denies Lopresti's SPAR allegations. (12(N)(3)(b) at 2.)

The parties agree that Lopresti was responsible for Carlisle's suspension, (12(M)(3) Ex. A at 112–19; 12(M)(3) Ex. B at 10–12), but they disagree as to who was responsible for her transfer, (compare (12(M)(3) at 14 with 12(N)(3)(a) at 4, and 12(N)(3)(b) at 4–5 with 12(M) at 8). Carlisle asserts that it was Walsh and Lopresti, but they both deny making the decision. (See 12(N)(3)(b) at 5; 12(M) at 8.) It is clear that Lopresti first recommended the transfer in his July 3, 1996 memorandum to Walsh. (See 12(N)(3)(b) Ex. E.) Lopresti testified in his deposition, however, that someone above him in the chain of command (whom he cannot recall, but possibly Walsh) asked him to write a memorandum after reviewing Carlisle's current performance and disciplinary record. (12(M)(3) Ex. B at 17–25.) Walsh's deposition testimony indicates that Carick made the decision after receiving Lopresti's recommendation, which Walsh approved. (12(M)(3) Ex. C at 18–20; 12(N)(3)(b) at 6; 12(M)(3) Ex. B at 18.)

On April 10, 1997, the EEOC issued a right to sue letter to Carlisle. (12(M)(3) at 2.) On December 29, 1997, Carlisle filed this action, which Walsh and Lopresti now seek to resolve through summary judgment.

## II. STANDARDS OF LAW

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view all evidence in a light most favorable to the nonmoving party, and draw all inferences in that party's favor. *Mangren Research & Dev. Corp. v. National Chem. Co.*, 87 F.3d 937, 941 (7th Cir.1996). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–250, 106 S.Ct. 2505; *Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1084 (7th Cir.1994). In determining whether a genuine issue of material fact exists, the Court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. 2505. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Id.* at 255, 106 S.Ct. 2505.

## III. DISCUSSION

Carlisle claims that Walsh and Lopresti suspended and transferred her in retaliation for her complaints to them and to the EEOC, thus violating her First Amendment right to free speech under 42 U.S.C. § 1983. Walsh and Lopresti attack every aspect of Carlisle's claim. First, they contend that her speech is not constitutionally protected and, even if it is, her interest in that speech is outweighed by the government's interest in promoting the efficiency of the public service it performs. Next, they assert that Carlisle's speech was not the motivating factor for her suspension or transfer, but rather that her behavior and

her performance brought about those actions. Finally, Walsh and Lopresti argue that, even if they did violate Carlisle's constitutional rights, they are entitled to qualified immunity in their individual capacities. The Court will address each argument in turn.

### A. Is Carlisle's speech protected by the Constitution?

Carlisle's speech consists of two written complaints—the memorandum she wrote to Walsh on November 27, 1995 and the EEOC charge that was later forwarded to the Cook County Sheriff's Office—and several verbal complaints made directly to Walsh and Lopresti. The inquiry into the protected status of speech is a matter of law, not of fact. *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The law in this area is clear: the Constitution protects a public employee's speech if it "is a matter of public concern, and the employee's interest in expressing herself ... [is not] outweighed by any injury the speech could cause to 'the interest of the State.'" *Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 572–574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The Seventh Circuit adopted the following test for determining whether speech satisfies the criteria announced in *Pickering*: 1) the speech would be protected if uttered by a private citizen; 2) it concerns something more than a personal employee grievance; and 3) the employer has not shown a convincing reason to forbid the speech. *See Hulbert v. Wilhelm*, 120 F.3d 648, 653 (7th Cir.1997).

### 1. Would Carlisle's speech be protected if uttered by a private citizen?

Initially, we find that Carlisle's speech would be protected if uttered by a private citizen. It is well established that speech alleging a racially discriminatory employment practice is inherently a matter of public concern. *See Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684 (distinguishing *Connick* from *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), which involved speech about racial discrimination, "a matter inherently of public concern"); *Little v. Illinois Dep't of Revenue*, 907 F.Supp. 280, 285 (N.D.Ill.1995). Simply put, employment discrimination of any kind is a matter of public concern. *See Pollard v. City of Chicago*, 643 F.Supp. 1244, 1249 (N.D.Ill.1986) (speech identifying potentially actionable discrimination by government employees constitutes a matter of public concern). This interest is only heightened when the potential discrimination involves a law enforcement officer who assists the judicial branch.

### 2. Did Carlisle's speech concern something more than a personal employee grievance?

Similarly, we find that Carlisle's speech concerned something more than a personal employee grievance. *Connick* establishes that, if a public employee speaks "upon matters *only* of personal interest," the expression of that speech and any alleged retaliation against the speaker is not a matter appropriately reviewed by federal courts. 461 U.S. at 147, 103 S.Ct. 1684 (emphasis added); *see also Marshall v. Allen*, 984 F.2d 787, 795 (7th Cir.1993). While it is true that at least one of Carlisle's complaints referred to the unpleasant conditions in the Judge's courtroom, the undisputed facts establish that the overriding reason for her speech was not her personal interest in being assigned elsewhere, but the discriminatory nature of the post assignments. *See Hartman v. Board of Trustees of Community College Dist. No. 508*, 4 F.3d 465, 471 (7th Cir. 1993) (citing *Colburn v. Trustees of Ind. Univ.*, 973 F.2d 581, 586 (7th Cir.1992)). Indeed, Carlisle denies that she had any preference for working with a particular judge or in a particular courtroom and Walsh and Lopresti presented no evidence

that she asked to be transferred out of the Judge's courtroom permanently.

In challenging Carlisle's ability to show her speech was protected, Walsh and Lopresti argue that because Carlisle "was not attempting a public airing of an alleged breach of the public trust," her complaints must have been of a purely personal nature. This argument is simply wrong: Carlisle went public with her complaints in January of 1996 when she filed a charge with the EEOC. Even if Carlisle had not filed such a charge, the Supreme Court has held that a public employee's right to free speech is not lost when she arranges to communicate privately with her employer rather than to spread her views on the evening news, which Lopresti and Walsh could not possibly prefer. *See Givhan*, 439 U.S. at 413, 99 S.Ct. 693. Therefore, Carlisle has satisfied the second element of the *Pickering* test.

### 3. Have Walsh and Lopresti shown a convincing reason to forbid Carlisle's speech?

The third and final question the Court must answer in determining whether Carlisle's speech is constitutionally protected is whether the employer has shown a convincing reason to forbid the speech. The Court holds that it has not. The Seventh Circuit has summarized the State's legitimate interest in forbidding speech:

> Under *Pickering*, the public employer's burden in attempting to justify the discharge of an employee for activities and statements involving matters of public concern depends on various factors ... 1) the need to maintain discipline or harmony among co-workers; 2) the need for confidentiality; 3) the need to curtail conduct which impedes the employee's proper and competent performance of [her] daily duties; or 4) the need to encourage a close and personal relationship between the employee and [her] superiors, where that relationship calls for loyalty and confidence.

*Breuer v. Hart*, 909 F.2d 1035, 1039–40 (7th Cir.1990). Walsh and Lopresti do not argue that Carlisle's speech interfered with any of the Sheriff's Department's legitimate interests. Instead, Walsh and Lopresti state that the "discretion utilized in the assignment of security personnel should be given great deference," and that the racially discriminatory practice was not occurring—a factual matter which is simply not relevant to this inquiry.

■ The undisputed material facts indicate that Carlisle's speech did not cause even a ripple of excitement or disruption within the Department. Walsh recalls that he may have discussed Carlisle's complaints with Lopresti, but that no internal investigation was ever conducted. Also, the assignment procedure that Carlisle hoped to stop continued throughout the remainder of the Judge's term at the courthouse. Furthermore, there is no evidence that Carlisle attempted to enlist the support of her fellow African–American deputies against Walsh and Lopresti or that her speech impeded her from properly or competently performing her duties.

In conclusion, after applying the undisputed facts to the well-established law, the Court finds that Carlisle's speech is constitutionally protected because it would be protected if uttered by a private citizen, it concerned something more than a personal employee grievance, and Walsh and Lopresti have not shown a convincing reason to permissibly forbid Carlisle's speech.

### B. Did Walsh and Lopresti Violate Carlisle's First Amendment Rights?

Having found Carlisle's speech to be constitutionally protected, the Court must determine whether Walsh and Lopresti violated Carlisle's First Amendment rights. To prevail under § 1983, Carlisle must show that Walsh and Lopresti deprived her of her First Amendment rights, that they intentionally caused this deprivation, and that they acted under the color of state law. *See Hulbert*, 120 F.3d at 654 (citing *Gregorich v. Lund*, 54 F.3d 410, 413

(7th Cir.1995); and *Rakovich v. Wade,* 850 F.2d 1180, 1189 (7th Cir.1988)). Defendants concede the third element, arguing only that they took no action to deprive Carlisle of her constitutional rights, intentionally or otherwise. Carlisle insists that she suffered adverse employment actions, intentionally undertaken by Defendants to chill her constitutional right to free speech.

### 1. Did Carlisle suffer an adverse employment action?

When an adverse employment action is likely to chill the exercise of constitutionally protected speech, it is actionable under § 1983. *Pickering,* 391 U.S. at 574, 88 S.Ct. 1731. Walsh and Lopresti argue that Carlisle's suspension and transfer did not amount to adverse employment actions. The record clearly indicates, however, that Carlisle's three-day suspension without pay cost her $345.00 in wages. Carlisle also argues that her three-month transfer to the Michigan Ave. courthouse caused her inconvenience in getting to and from work.

Seventh Circuit caselaw demonstrates that unpaid suspensions and unwanted transfers are sufficient to chill the speech of an employee in Carlisle's position. *See Gustafson v. Jones,* 117 F.3d 1015, 1021 (7th Cir.1997) ("It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights, including in particular retaliation through a transfer to a less desirable position."); *Knapp v. Whitaker,* 757 F.2d 827, 843–44 (7th Cir. 1985)); *Berndt v. Jacobi,* 781 F.Supp. 553, 558 n. 4 (N.D.Ill.1991) ("the court finds irrelevant the fact that Berndt did not actually lose his job but was 'merely' suspended instead") (citing *Altman v. Hurst,* 734 F.2d 1240, 1243 (7th Cir.1984) (rejecting a First Amendment claim where the plaintiff had neither been "fired *nor* suspended" for his allegedly protected speech) (emphasis added)). Thus, the Court finds that Carlisle's suspension and unwanted job transfer constitute adverse employment actions. We now turn to whether Walsh and Lopresti brought about those actions in retaliation for Carlisle's speech.

### 2. Were Walsh and Lopresti responsible for the adverse employment actions?

Although not specifically raised by Walsh and Lopresti, the record indicates some discrepancy over who transferred Carlisle to the Michigan Ave. courthouse. Reading the facts in the light most favorable to Carlisle, the Court finds a genuine issue as to whether Walsh and Lopresti caused Carlisle to be transferred. Walsh and Lopresti both deny making the decision to transfer Carlisle, blaming Carick instead. However, Lopresti's memorandum recommending Carlisle's transfer casts doubt upon Defendants' denials. Additionally, although Walsh may not have made the final decision to transfer Carlisle, he certainly approved the transfer before pushing it up the chain of command to Carick. A reasonable juror presented with these facts could find that Walsh and Lopresti were responsible for Carlisle's unwanted employment transfer.

### 3. Was the Defendants' decision to suspend and transfer Carlisle related to Carlisle's complaints to them and the EEOC?

The Court turns now to the final question: whether Carlisle's speech was a substantial or motivating factor in Defendants' decision to suspend her and later transfer her to the Michigan Ave. courthouse. *See Mt. Healthy Bd. of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Garrett v. Barnes,* 961 F.2d 629, 632 (7th Cir.1992). Carlisle bears the burden of establishing this element by a preponderance of the evidence, and, until she does, the defendants need not show a legitimate reason for the adverse action. *Roberts v. Broski,* 979 F.Supp. 746, 752 (N.D.Ill.1997) (citing *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568; *Cromley v. Board of Educ. of Lockport*

*High Sch. Dist.*, 17 F.3d 1059, 1068 (7th Cir.1994)). "The mere fact that protected speech precedes an employment decision does not create the inference that the speech motivated the employment decision." *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1368 (7th Cir.1993). Thus, the fact that Carlisle's speech preceded Walsh and Lopresti's decision to suspend and transfer her does not end our inquiry. Rather, there must be some form of evidence linking the speech to the adverse employment actions; "mere speculation" will not suffice. *Rakovich*, 850 F.2d at 1191.

Carlisle's suspension and transfer can be linked to her protected speech in three ways. First, her suspension and transfer were ordered during the same time-period that the EEOC was conducting its investigation into her charge of discrimination. Walsh and Lopresti were likely informed of Carlisle's charge during this period. Next, Carlisle's transfer was ordered just three days after she says she rejected an offer of an apology for the discriminatory policy. Finally, Lopresti specifically listed Carlisle's protected speech in his July 3, 1996 memorandum as one of his reasons for recommending her transfer: "[Carlisle] is currently in a grievance against R/LT. regarding false accusations of improper disciplinary procedure and racism, which accusations she has also used in the past." This language directly links Carlisle's speech to the adverse employment actions taken against her.

Walsh and Lopresti argue that they suspended Carlisle because of her argument with Lopresti in April 1996. Although Lopresti filed a SPAR against Carlisle in April 1996 recommending a suspension, her actual suspension did not take effect until three months later in the midst of the EEOC investigation, raising questions as to its true purpose. Walsh and Lopresti argue that Carlisle was transferred because she demonstrated poor work habits and negative interactions with others at the courthouse. They cite her tardiness and the her coworkers' negative assessments of Carlisle's performance. Although the record substantiates a claim that Carlisle was not an ideal employee, only a fraction of the instances Walsh and Lopresti rely on to justify her transfer occurred in 1995 and 1996. Additionally, over half of Carlisle's tardy arrivals were within the permissible time limit of 15 minutes or less. Also telling is the fact that Lopresti did not counsel Carlisle for any of these perceived problems and he did not formally address her "habitual tardiness" before recommending the transfer. Finally, if Carlisle's adverse employment actions did result from her allegedly poor behavior and performance, and if Walsh and Lopresti were the ones to recommend that action on those bases, it is incongruous that they would refuse to disclose that information to Carlisle at the time the action was taken.

Reading these facts in the light most favorable to Carlisle, the Court concludes that a reasonable jury could place substantial weight on the timing of Carlisle's suspension and transfer, her account of the rejected apology, and Lopresti's mention of Carlisle's speech in his memorandum to Walsh. A reasonable jury could also look skeptically upon Lopresti's act of probing back through Carlisle's record five years in order to justify her transfer, particularly since he did not counsel or discipline her for the perceived problems earlier. In sum, a reasonable juror could agree with Carlisle's argument that the reasons given by Walsh and Lopresti for her suspension and transfer were pretextual and, hence, not explained to her at the time the action was taken. Thus, a genuine issue of material fact exists as to the question of whether Walsh and Lopresti suspended and transferred Carlisle in retaliation for her protected speech.

In conclusion, the Court finds that Carlisle's suspension and unwanted transfer to the Michigan Ave. courthouse constitute adverse employment actions under § 1983 and that a genuine issue of material fact

exists as to whether Walsh and Lopresti brought about her transfer and suspension to retaliate against her protected speech. Having reached this conclusion, however, we must still consider whether Walsh and Lopresti are entitled to qualified immunity.

### C. Are Walsh and Lopresti entitled to qualified immunity?

■■■ In determining whether Walsh and Lopresti are entitled to qualified immunity, the Court must ask whether the right they are accused of violating was sufficiently particularized that reasonable persons in their positions would have known that their conduct was probably unlawful. *See Hulbert,* 120 F.3d at 655 (citing *Erwin v. Daley,* 92 F.3d 521, 525 (7th Cir.1996) (finding that the qualified immunity inquiry "focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials")). For the reasons set forth below, we conclude that a public employee's right not to be suspended and transferred in retaliation for her allegations of a racially discriminatory assignment practice was well established in 1996.

Indeed, *Connick, Little,* and *Pollard,* which established that speech alleging a racially discriminatory employment practice is a matter of public concern, were all decided before 1996. *See Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. 1684; *Little,* 907 F.Supp. at 285; *Pollard,* 643 F.Supp. at 1249. Likewise, it was clear in 1996 that if the overriding reason for an employee's speech is a matter of inherent interest to the public, her speech concerned more than a personal employee grievance. *See Marshall,* 984 F.2d at 795; *Hartman,* 4 F.3d at 471; *Colburn,* 973 F.2d at 586. The permissible circumstances in which Walsh and Lopresti could have forbidden Carlisle's speech were also

clear in 1996. *See Breuer,* 909 F.2d at 1039–1040 (listing circumstances where the employee's speech interferes with her ability to do her job or the general harmony of the workplace). Thus, at the time Carlisle complained about the alleged racially discriminatory assignment practice at the courthouse, Walsh and Lopresti should have known her speech on that matter was constitutionally protected.

Additionally, Walsh and Lopresti should have known in 1996 that an unpaid suspension and unwanted transfer were sufficiently adverse to chill Carlisle's protected speech. *See McGill,* 602 F.2d at 780 (finding an unwanted transfer to be retaliatory); *Altman,* 734 F.2d at 1243 (rejecting a First Amendment claim where the plaintiff had neither been *"fired nor suspended"* for his allegedly protected speech) (emphasis added). And, finally, if Carlisle's speech was a substantial or motivating factor in Defendants' decision to suspend and transfer her, it was clear in 1996 that taking such adverse action violated Carlisle's First Amendment rights. *See Garrett,* 961 F.2d at 632.

In conclusion, the Court finds no genuine issue of a material fact as to whether Walsh Lopresti are entitled to immunity; they are not.

### CONCLUSION

The Court denies Walsh and Lopresti's summary judgment motion (19–1) because genuine issues of material fact exist that need to be resolved at trial. The parties should immediately exhaust all remaining settlement possibilities for this litigation. If this case cannot be settled, a Final Pretrial Order which fully conforms to this opinion [6] should be filed with the Court on or before June 1, 1999. A status hearing will be held on May 27, 1999 at 9:30 a.m.

---

6. Pursuant to its authority under Fed.R.Civ.P. 56(d), all facts determined within this opinion shall not be relitigated at trial because the Court has determined that they exist without substantial controversy. Thus, the only issues at trial will be whether Defendants transferred Carlisle in retaliation her for her protected speech.

for the express purpose of setting a firm trial date.