Deborah KMETZ, Plaintiff,

v.

STATE HISTORICAL SOCIETY (WISCONSIN HISTORICAL SOCIETY), Board of Curators of the State Historical Society of Wisconsin (Wisconsin Historical Society), Director of the State Historical Society of Wisconsin, in his official capacity, George Vogt, in his individual capacity, and Michael Stevens, in his individual and official capacity, Defendants.

No. 03–C–107–C.

United States District Court, W.D. Wisconsin.

Feb. 3, 2004.

See also 2003 WL 23171624.

Edward R. Garvey, Madison, WI, for Plaintiff.

Richard Moriarty, Assistant Attorney General, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary and injunctive relief brought pursuant to Wis. Stat. § 895.65 and 42 U.S.C. § 1983. Plaintiff Deborah Kmetz contends that defendants George Vogt (the former director of the State Historical Society of Wisconsin), Michael Stevens and the current di-

rector of the society, retaliated against her for exercising her right to free speech under the First Amendment by selecting her position for layoff, giving her a negative "Letter of Direction," making negative comments on her performance review and failing to reinstate her when private funding for her position became available. In addition, she asserts that defendants State Historical Society of Wisconsin, Board of Curators of the State Historical Society of Wisconsin, Vogt, Stevens and the current director retaliated against her for disclosing abuses in government authority and substantial waste of government funds. Plaintiff contends that her comments about the society's name change, fusing of identities of the society and a privately funded historical foundation, fiscal mismanagement within the society and defendant Vogt's salary increase negotiations motivated defendants' actions. Before the court are defendants' motion for summary judgment and their motion to exclude the affidavit of Julie Feller. Jurisdiction is present. 28 U.S.C. §§ 1331 and 1367.

Defendants' motion will be granted with respect to plaintiff's claim under Wis. Stat. § 895.65 and plaintiff's complaint against defendants society and board of curators will be dismissed. Plaintiff has not adduced any evidence to show that defendants knew that she had met with state auditors to discuss her concerns of fiscal mismanagement within the society before they took any allegedly retaliatory acts against her. None of plaintiff's other statements constitute a "disclosure." Wis. Stat. § 895.65 is a whistle blower statute and protects public employees against retaliation only for disclosures of certain types of information; it does not protect employees that voice their opinions and offer criticism.

However, plaintiff has shown that her comments addressed matter of public con-

cern and defendants chose not to argue that their interest in promoting the public services their employees perform outweighs plaintiff's interest in commenting on matters of public concern. (Even if defendants fail to make this showing at trial, plaintiff will not be able to recover any damages relating to the letter of direction or for the weekly meetings individually because neither of these acts is sufficiently adverse to support a retaliation claim. However, she may recover for them if she persuades a jury that they form part of a campaign of petty harassment. In addition, plaintiff will not be entitled to injunctive relief unless she shows that defendants Stevens and director have the authority to carry out the relief she seeks.) Therefore, for the purpose of deciding defendants' motion, I conclude that plaintiff's comments are protected under the broader protection afforded by the First Amendment. Defendants' motion will be denied with respect to plaintiff's First Amendment retaliation claim.

■ As a preliminary matter, I must address defendants' motion to exclude the affidavit of Julie Feller regarding plaintiff's comments at a meeting of the Wisconsin Local History Council on June 15, 2002. (The dispute over the admissibility of this document at this stage is peculiar given that neither party relies on it in making any argument and it does not appear to be material to any of the issues raised on summary judgment.) In her affidavit, Feller avers that she has served as a legal assistant to plaintiff's lawyers and that she has 18 years of experience as a legal assistant. According to the affidavit, Feller transcribed tapes recorded by plaintiff from that meeting; the transcript is attached to the affidavit. Defendants argue that the affidavit lack sufficient foundation for a number of reasons. In response and in an attempt to cure the deficiencies, plaintiff has submitted a supplemental affidavit to which defendants ob-

ject because it was submitted after the deadline for summary judgment documents.

■ Defendants have correctly recited the general rule that after the summary judgment briefing period has ended, a party may not supplement an affidavit with information that was known to them at the time they filed the original. *E.g., Caisse Nationale de Credit Agricole v. CBI Industries, Inc.,* 90 F.3d 1264, 1269–70 (7th Cir.1996). However, this standard applies to new evidence and information relating to the *merits* of the issues presented in the summary judgment briefs; it does not apply to evidence relating exclusively to the admissibility of certain evidence. Other district courts have reached this conclusion in published opinions. *See, e.g., Heary Bros. Lightning Protection Co., Inc. v. Lightning Protection Institute,* 287 F.Supp.2d 1038, 1061–62, 1074 (D.Ariz. 2003) (relying on supplemental affidavit filed after motion to exclude and summary judgment briefing period to buttress foundation of original); *Berlyn, Inc. v. Gazette Newspapers, Inc.,* 214 F.Supp.2d 530, 539 (D.Md.2002) (same). Evidence regarding admissibility is properly submitted during briefing on admissibility; this is the logical counterpart to the rule stated by defendants.

Defendants argue that even if the court considers plaintiff's supplemental affidavit, the Feller transcript is inadmissible because it is "transparently deficient as an accurate record of what it purports to be." Dfts.' Reply Br. Supp. Mot. to Excl., dkt. # 83, at 5. First, they argue, plaintiff's supplemental affidavit does not identify plaintiff's method of recording the meeting and therefore, plaintiff has failed to establish that the recordings are reliable. Defendants ignore plaintiff's averments that the tape recorder she used was in proper operating condition at the time and that

her recollection of the meeting supports the accuracy of Feller's transcription of her comments.

The Court of Appeals for the Seventh Circuit has adopted a relaxed standard for authentication of an audio recording. In *Stringel v. Methodist Hospital of Indiana, Inc.*, 89 F.3d 415, 419 (7th Cir.1996), it held that authenticity may be established by the testimony of an eyewitness that the recording is consistent with his or her recollection. Because authenticity of the transcript follows the normal rules for the recording, 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 901.05[5] (2d ed.1997), plaintiff's testimony that the transcript is consistent with her recollection of her statements at the meeting is sufficient to authenticate the transcript.

■ Second, defendants note that plaintiff's affidavit indicates that she recorded the meeting on "four tapes" but the transcript is only four double-spaced pages. They argue that the four pages cannot possibly be the full transcript if the recording covered four tapes. However, Feller states in her affidavit that the four pages of transcript are only a portion of the full transcript; she does not represent the four pages as being a complete record of the entire meeting. A party is entitled to exclude irrelevant portions of a full document so long as the exclusion does not distort the evidence. *See, e.g., United States v. Sanders*, 962 F.2d 660, 678 (7th Cir.1992) (extracted portions of tape recording played before jury). Defendants Stevens and Vogt were both present at the meeting and would have reason to know if plaintiff had distorted her comments by omitting context, yet they neither argue that the extraction is a distortion nor identify any omitted information regarding context. Although they argue that Feller's affidavit does not indicate that the transcript includes all the statements plaintiff made at that meeting, they do not suggest that the letter of direction that defendant Stevens gave plaintiff regarding her comments at the meeting referred to any statement she may have made other than the ones in the transcript. Thus, any other comments plaintiff may have made at the meeting appear to be irrelevant to this case.

From the parties' combined proposed findings of fact, I find the following to be material and undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff was employed at the state historical society's office of local history from 1979 until she was laid off on June 29, 2002. (Plaintiff was one of only two employees in the local history office; Thomas McKay was the other). In 1986, she became a local history specialist. In that position, she was responsible for providing support services for local historical societies and serving as their liaison to the Wisconsin Council for Local History. All of her annual performance evaluations indicate that she was meeting or exceeding her employer's expectations.

Defendant society is a membership organization and an agency of the state of Wisconsin. It has 12,240 members. The acting director of the society is Bob Thomasgard. Defendant board of curators governs defendant society and appoints its director but does not manage its daily affairs. Patricia Boge has been a member of the board of curators since 1983, has served on its executive committee since 1996 and has been its president since June 2001. Her term as president will expire in June 2004. Defendant Vogt was the director of the society from 1996 until July 29, 2002. At all relevant times, defendant Stevens was employed by the society as an

administrator and state historian and had supervisory authority over plaintiff. (The parties dispute whether defendant Stevens was plaintiff's "immediate supervisor." This status would be relevant only if defendants were arguing that plaintiff was an "employee" within the meaning of Wis. Stat. § 895.65. Defendants have expressly waived this argument for purposes of summary judgment, making the dispute immaterial to defendants' motion.) In addition, defendant Stevens has authority to make personnel recommendations but does not have appointing authority for permanent classified positions.

During the 1990s, state budgets allocated a diminishing proportion of available public funds to defendant society. In response, the society sought additional earned revenue and private donations, particularly after defendant Vogt became its director. However, most of this money was targeted for specific programs. The society continues to rely on public funding for nearly 60% of its total revenue. In addition to seeking other sources of funding, defendant Vogt asked division administrators to recommend cuts on a number of occasions. In 1996, in response to one of these requests for recommendations, defendant Stevens proposed the elimination of one of the two positions in the office of local history. In later recommendations, defendant Stevens suggested that both positions be eliminated.

### B. *Name Change Initiative*

#### 1. *The proposal*

In February 2001, defendant Vogt presented the board of curators with a new marketing plan that had been developed by a marketing firm and paid for by the Wisconsin Historical Foundation, a private non-profit organization. A marketing committee of the society narrowed the logo choices developed by the firm to two. Defendant Vogt selected just one to present to the board. The plan included changing the name of the "State Historical Society of Wisconsin" to "Wisconsin Historical Society" and adopting a "Wisconsin Hi Story" logo. A committee of the board approved the plan but no vote of the board's full membership was taken.

Plaintiff heard about the name and logo change for the first time in March 2001. She did not like the new logo but thought that this change was insignificant. Plaintiff objected much more strongly to the name change because she thought that the word "state" reflected public ownership. She believed that the change was proceeding too quickly given the importance of the issue.

#### 2. *Plaintiff's criticism*

At a staff meeting on April 16, 2001, plaintiff voiced her concerns about the name change and the pace at which decisions about this change were being made but she did not mention the logo. Both defendants Vogt and Stevens attended the meeting and many staff members applauded plaintiff's comments. Five days later, defendant Vogt presented the name and logo change to the Wisconsin Council for Local History. Most of the comments council member made about the name change were negative.

In a letter to a former society director dated May 22, 2001, defendant Vogt wrote:

> The name change hasn't bothered many, except for Debby Kmetz, Brer McKay, and the Wisconsin Council for Local History. To my mind, thats a strong vote in favor. A more change averse group I've never met.

In late May 2001, a reporter from *The Capital Times* called plaintiff, asking for a staff reaction to the new logo. The reporter told plaintiff that she had gotten plaintiff's name from other staff who had been at the April 16, 2001 meeting. Plaintiff agreed to talk to the reporter a few days

later on her own time. Plaintiff made comments similar to those she had made at the April staff meeting. On June 4, 2001, *The Capital Times* ran a story about the name change, including the following:

> Debbie Kmetz, a local history specialist who works at the society, spoke out at a recent staff meeting.

> "There is a lot of power in a name and we should think very, very deeply when we want to change our name," she said.

> "We've had the name 'State Historical Society of Wisconsin' a long, long time. We're 150 years old and it's carved into our building. *I mean,* it's carved into it!"

Plaintiff was the only society employee quoted in the article who criticized the change.

The same day the article was published, defendant Stevens received an email from Thomasgard, stating, "We think you should talk to Debbie about how her public words can create problems *after a decision has been made.*" Thomasgard had attached *The Capital Times* article to the email. Defendant Stevens forwarded the email to defendant Vogt. Defendant Vogt would have preferred that plaintiff keep her criticisms internal and was concerned that plaintiff had not followed proper procedure in contacting the press. Particularly, he feared that she may have spoken to the reporter on state time, used state resources or presented herself as speaking on behalf of the society. He asked defendant Stevens to talk to plaintiff about proper press contact procedures and about appropriate ways to raise criticism after decisions are made. The next day, the newspaper ran an editorial criticizing the name change and defendant Vogt personally. Plaintiff's quotes were reprinted in this editorial.

### 3. *Reaction to plaintiff's criticism*

On June 6, 2001, defendant Stevens spoke to plaintiff about the article. He was concerned that she had not followed proper procedure in contacting the press. Plaintiff told him that the reporter had contacted her and that she felt compelled to confirm her comments at the April staff meeting. They discussed whether that meeting had been an open meeting. Defendant Stevens told plaintiff that the name change was an internal debate and that once the board of curators and management made their decision, the debate was over. He also indicated that he believed the article could damage the society's reputation and that it was his impression that the board had approved the change.

At a meeting of the board of curators in Manitowoc, Wisconsin, on June 15, 2001, there was a table with a number of handouts, one of which was a copy of the *Portage Daily Register*'s version of the June 4, 2001 article in *The Capital Times* article. Plaintiff's comments were circled; the comments of staff members supporting the change were not. At the meeting, defendant Vogt said he was upset about staff speaking to the media and that "freedom of speech is not absolute in the workplace." He rebutted the objections that had been raised by members of the Wisconsin Council for Local History but said that he had bowed to the sensibilities of "friends in local history" and not changed the name in state statutes. One of the members of the local history council spoke later to say that she had received a lot of correspondence about the matter.

On July 3, 2001, defendant Vogt sent an email to several members of the society's management team, including defendant Stevens. In it, he said under the word "Confidential":

I want to respond to your concerns about letting Debby remain in a highly visible position [co-host of the television program "Wisconsin Stories"] while, at the same time, speaking publicly against some of the changes that the management team and board have instituted. After thinking about the pros and cons and discussing the issue with Patt Boge and Malcom Brett, I've concluded that we only buy more trouble by removing her from the co-host role for the second season. Interestingly, Patt and Malcom both found her behavior deplorable, but both agreed that we'd stir up a hornet's nest if I pulled her now. What I am going to do—and Malcom is completely comfortable with this—is find a new co-host for season three and return DK to full-time duty in Public History at the conclusion of filming for this season, the better to serve history.

. . . . .

I appreciate your concern and counsel about the behavior issue and your willingness to confront it directly. My judgment is that we need to approach this incrementally and very carefully because of the coming capital campaign.

On November 14, 2001, plaintiff was informed that she was no longer needed for the program although she continued taping the second season into 2002. Ultimately, the program was cancelled before it went into its third season because of its cost.

### C. *The Audit*

The state Legislative Fiscal Bureau began an audit of the society in April 2001. By July 26, 2001, the bureau estimated that the audit would be complete in approximately 2½ weeks. On August 23, 2001, plaintiff met with an auditor with the Legislative Audit Bureau and the auditor's supervisor for two hours of her own time. She expressed concerns that the society's money was being spent extravagantly and that money was improperly exchanged be-

tween the publicly funded society and the privately funded foundation. Plaintiff had set the meeting up earlier in the month when the auditor visited the society. On August 31, 2001, one of the auditors asked Thomasgard and defendant Vogt for certain foundation records. On September 24, 2001, state auditors asked defendant Vogt for additional records relating to "expenditures billed to and paid by the foundation that directly benefit the Society or its employees." Defendant Vogt sent a memo to the foundation's executive committee in which he questioned the authority of state auditors to review the records of privately funded organizations and asked that in deciding what action to take, the committee consider potential fallout and the upcoming fund raising campaign. Neither defendant Stevens nor defendant Vogt knew that plaintiff had spoken to a state auditor until she filed the complaint in this action.

### D. *Weekly Meetings with Defendant Stevens*

Defendant Stevens had started the practice of meeting with the publishing unit of the Division of Public History on a weekly basis in 1998. In 2001, he instituted a weekly meeting with the staffs in the office of local history and the office of school services. In August of 2001, he decided that it would be more efficient to meet with these two offices in separate meetings. On September 7, 2001, plaintiff noted that defendant Stevens had asked for the first time to review all standard material produced by the office before it was sent to local historians. Also, for the first time, he wanted to know how convention materials were produced and distributed.

### E. *Budget Cuts*

The 2001–2003 biennial state budget bill required the society to take what was effectively a 6.5% general purpose revenue cut, amounting to approximately $688,000.

In addition, it required the society to pay the state a "lapse" of approximately 5% ($174,200) of its earned revenue for each of the two years.

### 1. Budget reduction exercise

In January 2002, Thomasgard and defendant Vogt asked division administrators and defendant Stevens to do a budget reduction exercise. The administrators were to assume a worst case scenario and propose cuts for 30% of their divisions and 30% of the society as a whole. Relying at least in part on the criteria of audience served, revenue generation potential and ability to serve other society programs, defendant Stevens proposed that the Office of Local History be cut. He evaluated only the programs of the office of local history and not the individual work of plaintiff and McKay on society-wide projects. For example, he did not consider plaintiff's work on the television program "Wisconsin Stories," because he did not consider it to be a project of the office of local history.

### 2. Defendant Vogt's budget proposal

Defendant Vogt had completed the majority of the budget proposal in mid-January and finished all of them before a public history division staff meeting held on February 26, 2002. In making decisions about what to cut, he relied at least in part on the following priorities: (1) spreading cuts throughout the society; (2) leaving support funding (such as funds for supplies, services and term employees); (3) preserving museum funding; (4) cutting low priority vacancies first; and (5) preserving programs with the largest and most diverse audiences. He did not recommend that both positions in the office of local history be cut because he hoped that if the programs remained in place, it might be possible to rebuild them in the future.

Defendant Vogt and Thomasgard presented the plan to society division administrators and defendant Stevens at some point in mid-February 2002. On March 5, 2002, at the direction of the society's management and human resources director, defendant Stevens told plaintiff that her position would be cut under the plan that defendant Vogt presented to the board of curator's executive committee on March 6, 2002, and to the full board on March 15, 2002. The proposal eliminated 6.5 vacant positions and 11 filled positions and included some restructuring, which was eventually dropped. The plan cut a total of $1.1 million from the society's budget. (In the version of the plan presented to the full board on the fifteenth, $175,000 was identified as a 1.5% additional cut that the state legislature had passed the day before. However, the actual additional cut was only .5%, or approximately, $51,600. Thomasgard had misunderstood a legislative fiscal bureau analyst who told him that there would be a cut of .5% on top of the 1% cut proposed by the Joint Finance Committee. 1.5% of the total budget was actually only $151,800.) Defendant Vogt did not present any alternative plans to the board of curators or the society.

The executive committee spent one hour and twelve minutes discussing the plan, the full board discussed the plan for nearly four hours before approving it. No statement by plaintiff influenced any board member's decision to vote to approve the proposed plan. The board did not conduct an independent investigation of what cuts were needed but instead relied on the information provided by defendant Vogt and the society's management team. During the full board discussion, John Grek, a board member and president of the Wisconsin Council for Local History, objected to the elimination of the position in the office of local history. The board's vice president, Mark Gajewski, challenged this objection, arguing that a majority of the state's local history societies were not

members of the society and therefore, the liaison position in the office of local history was not as important as some positions in other areas. In addition, Grek expressed his disagreement with the sentiment of a communication he had seen from defendant Vogt to board members. In the communication that Grek had seen, defendant Vogt stated that it would be unprofessional for staff to speak publically about the budget proposal while it was pending. The executive committee and the board of curators discussed only the positions and not the persons filling them.

### F. Staff Meetings of February and March 2002

On February 26, 2002, the society's division of public history met. At the meeting, plaintiff asked defendant Vogt if the foundation's name had officially been changed from the "Wisconsin History Foundation" to the "Wisconsin Historical Foundation." Defendant Vogt responded that it had so that it would match the society's new name. Plaintiff asked defendant Vogt whether he was negotiating a salary increase with either the board of curators or the foundation and he responded that he was. The following day, defendant Vogt sent around an email, indicating that a "public history division staffer" had asked him whether he was negotiating a salary increase. He attached a letter from Boge explaining the situation.

At a general staff meeting on March 18, 2002, Thomasgard and defendant Vogt fielded questions about the budget cuts. Plaintiff asked why so many union positions had been selected for layoff and why no supervisory or managerial positions were selected. She noted also that 10 out of 12 of the persons selected for layoff were women.

### G. Intervention by the Legislature

Shortly after the layoffs were announced, the Wisconsin Council for Local History initiated a letter writing campaign, primarily for the purpose of encouraging the restoration of plaintiff's position in the office of local history. In response, the society engaged in a letter writing campaign to legislators, emphasizing that it prioritized preservation of the library and archives. The state senate reduced the lapse by $100,000 and earmarked this money for local history. (The reduction was short-lived; the legislature imposed an additional lapse of $174,000 on the society in November 2002. The earmark was short-lived also; the legislature expanded it to the library and eventually eliminated it.) Despite the reduction, the society did not change the cuts that the board of curators had approved.

### H. Private Funding for Plaintiff's Position

In late March 2002, George Miller, a supporter of the office of local history, approached McKay (plaintiff's co-worker in the office) to ask how he could help save plaintiff's position. Miller offered to put up a grant for half of the $64,000 necessary to support the position for a year if the local history council could match the amount through private fund raising. McKay mentioned the offer to defendant Stevens, who told defendant Vogt about it. On April 4, 2002, defendant Vogt called a meeting of the executive committee of the board of curators to discuss the offer. The executive committee voted to accept the private funding for plaintiff's position so long as certain conditions were met (making the position temporary because there was no guarantee of future funding and giving priority to restoring library funding over restoring positions). The next day, before the council had even agreed to undertake this private fund raising, Grek received a letter from the executive committee regarding the outcome of the meeting and explaining the board's conditions. Grek objected to a number of them. In

particular, he objected to the fact that if the council raised and donated the funds, the position would not necessarily be approved by the state Department of Administration and even if it were approved, the society could assign duties to the position unrelated to local history.

Grek sent the society management a letter dated June 17, 2002, indicating that the local history council had decided to try to privately raise the $70,000 the society's executive committee had requested for the continuation of plaintiff's position. The council disagreed with the committee's condition that plaintiff's position would continue only as a temporary project position and hoped that the letter would initiate a bargaining process regarding the committee's conditions. In response, Boge sent Grek a letter reiterating the committee's conditions. Later in the month, Grek called Boge to let her know that the fund raising was going well and Boge reiterated that only the project position was on the table. Boge related this conversation to defendant Vogt in an email, who wrote in response: "You are really working hard for more roses, you know! I think you handled it well. Maybe now he'll shut up for a while."

### I. Appeals for Reconsideration

On April 12, 2002, defendant Vogt announced that he was resigning from the society. On April 20, 2002, the administrative committee of the Wisconsin Council for Local History met to discuss the recent budget cuts, among other matters. The committee passed a resolution encouraging the board of curators to reconsider the cuts and investigate alternatives. Plaintiff, defendant Stevens, Boge and Gajewski all attended the meeting. Plaintiff asked defendant Stevens why her position had been cut. Defendant Stevens responded that certain things could not be discussed in the society and that her position did not generate much revenue.

In a letter dated April 26, 2002, ten of the twelve staff members whose jobs were at risk wrote a letter to the board of curators, expressing their concern that the board had not fully realized the scope and gravity of the budget cut. They also noted that the layoffs affected older workers, women and union members disproportionately. In the letter, the staff members acknowledged their personal interest in the matter and asked to meet with the board at the next meeting in May. Defendant Vogt sent Boge an email in which he counseled against reopening the budget issue and offered to discuss his reasons for this recommendation. Later, defendant Vogt said that his reasons were his concern that reopening the issue would elongate a process that had proven very trying for Boge and his belief that nothing had changed to warrant reconsideration.

### 1. Alternate budget proposal

When Grek learned that the board of curators would not be considering the employees whose positions were at risk at its May meeting, he asked the employees to help him develop an alternative budget cut proposal. Grek asked Boge to be put on the agenda so that he could discuss the local history council's resolution to ask the board of curators to reconsider its budget decision. Grek presented this proposal at the meeting, which was held on May 22, 2002. It would not make any cuts in any permanent positions, but it had certain shortcomings; for instance, the plan did not account for $35,700 of the cuts. The board discussed the plan for nearly an hour. Several state legislators who sat on the board advised their colleagues that future cuts were likely. The board voted 22 to 2 against reconsidering the budget decision. None of the board members voting against reconsideration were influenced by any statement made by or attributed to plaintiff.

## 2. *Reaction to the reconsideration requests*

The following is the text of a draft document that defendant Vogt prepared for use at the society staff meeting the following day:

> The policy of the Board and the Society is to implement the budget reductions that were passed at the March 15, meeting and we will do so.
>
> I want to speak frankly about appropriate staff behavior. For staff members of the Society to prepare and advance their own budget reduction plan that is in opposition to both management decisions and adopted board policy is unacceptable and unprofessional behavior. It is insubordinate behavior to ignore the board's reaffirmation of policy and then distribute copies of Grek's (or should I say YOUR) plans to staff members, and I want to make certain that each of you understands that and the consequences of insubordination.
>
> Each of you, as a staff member, has to make a choice: a true professional now accepts board policy, even though you may passionately disagree with it, or you resign from the staff. If you choose to continue as a staff member, you cannot continue to actively oppose board and management decisions without reaping the consequences. I am here to tell you today in no uncertain terms that I and the rest of management will take strong and immediate action if you engage in insubordinate behavior, including media campaigns and rallying of constituencies. Although in Madison it sometimes seems as though no debate is ever over and no issue is finally decided, the board's debate about budget reductions at the Society if [sic] over. ~~The penalties for insubordination include written reprimands, suspension without pay, and possible immediate dismissal.~~
>
> I know most of you are professional to the core and will not countenance this kind of behavior. I have great faith in the majority of you, and I want to guarantee to you as best I can a workplace free of the kind of behavior that professionals deplore.

Defendant Vogt made similar comments at the meeting. He did not cross out the last sentence of the third paragraph, but believes that Thomasgard did.

### J. *June 15, 2002 Local History Meeting*

On June 15, 2002, plaintiff attended a local history council meeting in her official capacity to discuss support that the society would continue to provide to the local history community after plaintiff's departure. At that meeting, plaintiff made some comments about the role of her position at the society and the void that her leaving will create. Defendant Vogt, defendant Stevens and Gajewski were present as this meeting and heard plaintiff's comments. Also at this meeting, the council decided to try to privately raise funding for plaintiff's position.

Two days later, Ann Koski, director of the society's museum complained to defendant Stevens about what plaintiff had said during the meeting, suggesting that plaintiff had disparaged both the society and its staff. That same day, defendant Vogt sent defendant Stevens an email containing the following: "Alice [the society's personnel director] will talk to you about a 'letter of direction' for Kmetz, indicating that her kind of behavior is unacceptable and putting it on the record." On June 19, 2002, plaintiff received the letter from defendant Stevens, directing her not to engage in fund raising for her position and criticizing the comments she had made at the June 15th meeting. In this letter, defendant Stevens also informed plaintiff that in some cases, her behavior constituted direct

violations of the society's work rules and codes of ethics, but he did not cite any specific ones. Defendant Stevens told plaintiff that a letter of direction, unlike a letter of reprimand, is not intended to be disciplinary and therefore, would not be placed in her personnel file.

### K. *Annual Performance Evaluation*

On June 24, 2002, plaintiff received her final annual work evaluation in which defendant Stevens indicated that she was meeting job expectations but also stated that she had failed to make any progress in the past year in presenting the society in a positive light. In addition, defendant Stevens wrote that twice in the past year, he had had to discuss with plaintiff the negative impact of her "public comments while on Society time about policies and decisions made by the Board." He concluded that "While vigorous discussion prior to decisions is helpful in providing various points of view, once decisions are made she has a responsibility to proactively explain and implement positions taken by the society's board and management."

### L. *Further Attempts at Private Funding*

In a letter dated June 25, 2002, eleven state senators wrote to defendant Vogt and Thomasgard, urging them to accept the private funding to reinstate plaintiff's position either permanently or as a temporary project position.

Grek held on to the money that the local history council had raised, hoping that the society would reconsider its position after defendant Vogt's resignation in July. After an encouraging meeting with Thomasgard, Grek sent a formal offer dated September 4, 2002, asking the society to accept funding for a one-year extension of plaintiff's position. In response, Grek received a letter from Boge dated September 11, 2002, reiterating all of the conditions that the executive committee had set on April 5, 2002. Discouraged, the local history council's administrative committee voted to return the funds to the donors.

### OPINION

#### A. *Scope of Plaintiff's Claims*

#### 1. *Failure to rehire claim*

■ First, defendants argue that in plaintiff's response to their motion for summary judgment, she attempts to avoid the limited scope of her complaint by adding a number of new claims. The parties dispute whether the complaint states the claim that defendant Vogt retaliated against plaintiff by failing to rehire her when private funding became available. In the cause of action section of the complaint, there is a general allegation that "defendants" retaliated against plaintiff by failing to rehire her when public funding became available. Defendants argue that plaintiff cannot maintain a claim relating to private funding against defendant Vogt or defendant Stevens because she specifically incorporated her factual allegations into this claim and one of her factual allegations is that Boge (and not defendant Vogt or defendant Stevens) rejected the local history council's offer to provide private funds for plaintiff's position.

Defendants' argument is not persuasive. First, Fed.R.Civ.P. 8(a) requires only that a complaint state those "bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002) (citing *Beanstalk Group, Inc. v. AM General Corp.,* 283 F.3d 856, 863 (7th Cir.2002)). It requires nothing more, not even an allegation of a chronology of events from which retaliation may be inferred. *Walker v. Thompson,* 288 F.3d 1005, 1009 (7th Cir.2002) (citing *Higgs,* 286 F.3d at 439).

Second, plaintiff's allegation that Boge rejected the offer formally does not pre-

clude the possibility that others participated in the decision to reject the funding. A complaint states those claims that are "*consistent* with the allegations." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992) (emphasis added).

Finally, the full text of the sentence on which defendants rely reads that plaintiff "realleges and incorporates herein each preceding paragraph of this complaint (including the one about Boge's rejection), and *further* allege as follows." (emphasis added). This sentence does not confine plaintiff's claims to the allegations but expands her claims beyond them. At most, plaintiffs' failure to allege specifically that defendant Vogt and Stevens had some role in rejecting the private funding is a technical defect. Complaints should be construed as a whole to do "substantial justice." Fed.R.Civ.P. 8(f); *Black v. Lane*, 22 F.3d 1395, 1400 (7th Cir.1994). It would not do substantial justice to the complaint to read out of it a claim that all defendants retaliated against plaintiff by refusing to rehire her when private funding for her position became available merely because she identified the specific person who communicated to her the formal rejection of the funding.

> 2. *All other "new" claims plaintiff identifies in her response to defendants' summary judgment motion*

■ Although the pleading standard is very liberal, a plaintiff must specify her protected activity and the act of retaliation in her complaint. *Higgs*, 286 F.3d at 439. Plaintiff argues that she reserved the right to name other speech events and retaliatory activities by using language in her complaint to indicate that the named speech and retaliatory acts were not exclusive. She adduces evidence obtained through discovery to support new claims that she argues are made pursuant to this reserved right. A reserved right to expand an existing claim or add a new claim runs afoul

of the notice pleading standard. *Id.* (merely alleging retaliation without identifying protected speech and act of retaliation is insufficient). Plaintiff has identified four acts of speech (her comments about the name change, her statements regarding the merger of the identities of the society and the foundation, her speech about the possible co-mingling of funds between the two and her comments about defendant Vogt's salary increase in a time of fiscal uncertainty) and four retaliatory acts attributed to defendants generally (selection of her position for layoff, issuance of the letter of direction, negative comments on her performance review and failure to reinstate her). Although plaintiff need not allege all the facts she would have to prove to succeed on these claims, her claims are limited to these acts of speech and these acts of retaliation.

■ Although plaintiff argues that the evidence she has obtained through discovery supports new claims, she uses it primarily as supporting evidence to show retaliatory animus and pretext. As supporting evidence, this information was properly excluded from the complaint. 2 *Moore's Federal Practice* § 8.04[5] ("Pleading evidence may violate the short and plain statement requirement of Rule 8(e)(1)."). A number of defendants' statements regarding plaintiff's speech are relevant in showing that defendants opposed her speech even though she may not recover damages for any injury caused by these comments.

For example, the following evidence is relevant to the issue whether plaintiff's speech was a substantial or motivating factor in defendants action: (1) defendant Vogt's letter to a former director of the society to the effect that, in defendant Vogt's mind, plaintiff's objection to the name change was a vote in favor of it dated May 22, 2001; (2) defendant Vogt's

directing defendant Stevens to talk to plaintiff about the comments she made that were published in *The Capital Times;* (3) defendant Vogt's statement at the June 15, 2001 board of curators meeting; (4) defendant Vogt's email of July 3, 2001, regarding removal of plaintiff from her highly visible position as co-host for "Wisconsin Stories"; (5) the communication Grek saw from defendant Vogt to board members, saying it was unprofessional for staff to speak publicly about the budget proposal while it was pending; (6) defendant Vogt's letter to Boge recommending that the at-risk employees be denied their request to petition the board to reconsider its budget decision.; and (7) defendant Vogt's statements at the May 23, 2002 society staff meeting. In addition, plaintiff may use the fact that defendant Stevens did not include plaintiff's work on "Wisconsin Stories" in his computation regarding the contribution of the local history office to the society to show that the neutral factors he alleged governed his decision to recommend plaintiff's position for layoff were actually pretextual. I will not analyze the relevance of every new fact plaintiff relies on in responding to defendants' motion to dismiss. It is sufficient to note that plaintiff is permitted to rely on this information to support the claims she has identified in her complaint.

B. *First Amendment Retaliation*

"[P]ublic employees do not relinquish all rights to free speech under the First Amendment, even when that speech relates to their employment." *Hulbert v. Wilhelm,* 120 F.3d 648, 650 (7th Cir.1997) (citing *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). It "'is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for different reasons, would have been proper.'" *Howland v. Kilquist,* 833 F.2d 639, 644 (7th Cir.1987) (quoting *Buise v. Hudkins,* 584 F.2d 223, 229 (7th Cir.1978)). Thus, public employers are prohibited from retaliating against employees for their speech if that speech is protected under the First Amendment. *Abrams v. Walker,* 307 F.3d 650, 654 (7th Cir.2002); *Trulock v. Freeh,* 275 F.3d 391, 404 (4th Cir.2001) ("public officials are prohibited from retaliating against individuals who criticize them").

In order to establish a prima facie case of First Amendment retaliation, a plaintiff must demonstrate that (1) her speech was protected under the First Amendment; (2) the defendants took adverse action against her; and (3) her conduct was a substantial or motivating factor in the defendants' actions. *Williams v. Seniff,* 342 F.3d 774, 782 (7th Cir.2003); *Abrams,* 307 F.3d at 654.

Generally, a nonmoving party must adduce enough evidence to permit a reasonable jury to find in her favor for each of the elements on which she will bear the burden of persuasion at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted). Thus, I will address only the shortcomings defendants identify in their motion and accompanying brief.

1. *Protected speech*

The threshold question for a retaliation claim under the First Amendment is whether the employee engaged in protect-

ed speech. *Patton v. Indianapolis Public School Board,* 276 F.3d 334, 340 (7th Cir. 2002). As noted above, plaintiff has identified four topics about which she expressed concern: (1) the removal of the word "state" from the society's name; (2) the merger of the identities of the society and the foundation; (3) the possible comingling of funds between the two; and (4) defendant Vogt's salary increase in a time of fiscal uncertainty.

■■■ In the employment context this determination is governed by the two-step analysis set forth in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The first step of the *Connick–Pickering* test requires a determination whether the employee engaged in speech that is a matter of public concern. *Williams,* 342 F.3d at 782; *Trejo v. Shoben,* 319 F.3d 878, 884 (7th Cir.2003). The second requires the court to determine whether plaintiff's interest as a citizen in commenting on matters of public interest outweighs the state's interest in promoting public services. *Williams,* 342 F.3d at 782. As to the first step, the employee must show that she addressed "a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson v. Jones,* 290 F.3d 895, 907 (7th Cir.2002). A court must consider the content, form and context of the speech, *Id.* at 906–07. Content is the most important factor, *Kuchenreuther v. City of Milwaukee,* 221 F.3d 967, 974 (7th Cir.2000), "though '[t]he speaker's motivation and choice of forum are [also] important because, absent those factors, every employment dispute involving a public agency could be considered a matter of public concern.'" *Wright v. Illinois Dept. of Children and Family Services,* 40 F.3d 1492, 1501 (7th Cir.1994) (quoting *Barkoo v. Melby,* 901 F.2d 613, 618 (7th Cir.1990)).

■■■ Plaintiff touched upon matters of public concern when she spoke about the possible commingling of the funds of the privately funded foundation and the publicly funded society and questioned of defendant Vogt's salary increase at a time of fiscal uncertainty. "An employee's ability to highlight the misuse of public funds ... is a critical weapon in the fight against government corruption and inefficiency." *Wainscott v. Henry,* 315 F.3d 844, 849 (7th Cir.2003); *Marshall v. Porter County Plan Commission,* 32 F.3d 1215, 1219 (7th Cir.1994). Plaintiff's comments regarding the merging of the identities of the foundation and the society piggybacks on her concern about wrongful commingling of funds of the two entities. Plaintiff expressed her concern that with two similar names (Wisconsin Historical Society and Wisconsin Historical Foundation), the two institutions could confuse prospective donors and financial institutions. All three of these issues address potential fiscal mismanagement of public institutions; therefore, all three implicate a matter of public concern. *Id.*

■■■ It could be argued that plaintiff had a personal interest in defendant Vogt's salary increase because money that would be used to fund this salary increase could have been applied to help save her position. However, "[a] personal aspect contained within the motive of the speaker does not necessarily remove the speech from the scope of public concern." *Marshall,* 32 F.3d at 1219. *See also Gustafson v. Jones,* 290 F.3d 895, 908 (7th Cir.2002). In this case, it is not clear that plaintiff even knew that her position was at risk at the time she made these comments. The staff meeting at which she questioned defendant Vogt about his negotiations for a salary increase was on February 26, 2002. Defendant Stevens did not tell plaintiff

that her position was identified for layoff until March 5, 2002.

At first blush, it might seem that opinions about a state agency name change would present a closer case. However, plaintiff did not merely state her personal opinion about the name change. Instead, she stated her belief that the change could erode public ownership of the society and cautioned that the society's management might not be giving thorough consideration to the issue. It is well established that content is the most important factor in determining whether a statement addresses a matter of public concern. *Kuchenreuther*, 221 F.3d at 974. Plaintiff's comments were not merely about the society name change; they addressed the management's decision making processes and the society's continuing role as a predominantly public institution.

Additionally, these comments were published in at least two newspapers and quoted in at least one editorial. The Court of Appeals for the Seventh Circuit has recognized that media coverage is an indicium of public concern. *Zorzi v. County of Putnam*, 30 F.3d 885, 896–97 n. 11 (7th Cir. 1994); *Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir.1990). Finally, plaintiff had nothing to gain personally and no motive other than her concern that the society might lose its identity as a public entity. The lack of any motive for making comments is a strong indication that the comments address a matter of public concern. *Hulbert*, 120 F.3d at 653 (speech touches matter of public concern if it would be protected if spoken by private citizen and concerns something more than personal grievance); *Gustafson*, 290 F.3d at 907 (defining public concern as something other than personal grievance); *Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir.1993) (same).

In deciding whether speech is protected, the second step involves weighing plaintiff's interest as a citizen to comment on the matter of public concern against the state's interest in " 'promoting the public services it performs through its employees.' " *Williams*, 342 F.3d at 782 (quoting *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir.1999)). Court use the following factors in making this determination:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform his responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision making; and (7) whether the speaker should be regarded as a member of the general public.

*Id.*

▮ Whether speech is constitutionally protected is a question of law to be decided by the court and not a jury. *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2000). However, defendants have not challenged this aspect of plaintiff's claim in their motion for summary judgment. It is the public employer's burden to show that the state's interest outweighs the plaintiff's interest in the speech. *Wainscott*, 315 F.3d at 851; *Hulbert*, 120 F.3d at 650. Therefore, for the purpose of deciding this motion for summary judgment, I must assume that defendants had no legitimate interest outweighing plaintiff's interest as a private citizen in making her comments.

2. *Adverse action*

▮ An employee must demonstrate an adverse employment action by the defendant to succeed on a First Amendment retaliation claim. *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187,

191 (7th Cir.1995). The term "adverse employment action" means something far less in the First Amendment context than in a Title VII case. *Power v. Summers,* 226 F.3d 815, 820–21 (7th Cir.2000). In this context, an act is sufficiently adverse if it " 'creates the potential for chilling employee speech on matters of public concern,' " *Thomsen v. Romeis,* 198 F.3d 1022, 1027 (7th Cir.2000) (quoting *DeGuiseppe,* 68 F.3d at 192), and is more than a mere inconvenience. *Id.*

a. Weekly meetings

▮ Defendant Stevens instituted weekly meetings with all of the staff members that he supervised. "[E]nforcing a policy applicable to all employees cannot reasonably be described as a penalty for speech." *Taylor,* 214 F.3d at 792. Plaintiff argues that shortly after she spoke to state auditors, defendant Stevens separated the weekly meetings of the office of local history from the office of school services and began to scrutinize plaintiff's work more harshly than he had in the past. Having work scrutinized and even corrected in a manner not overtly disciplinary is the sort of "mere inconvenience" that will not sustain a First Amendment retaliation claim by itself. *Thomsen,* 198 F.3d at 1027–28 (written and oral reprimands about not following certain rules not materially adverse).

b. Letter of direction

▮ The letter of direction defendant Stevens gave plaintiff comes closer to meeting the materially adverse standard but not close enough. The Court of Appeals for the Seventh Circuit has held that a conduct memo was sufficiently adverse in some cases but not in others. *Yoggerst v. Stewart,* 623 F.2d 35, 39 (7th Cir.1980) (memo may be materially adverse); *Thomsen,* 198 F.3d at 1027–28 (letter not sufficiently adverse). The distinguishing features between these cases are whether the letter is disciplinary in nature and whether it is placed in the employee's personnel file. *Compare Yoggerst,* 623 F.2d at 39 (disciplinary and placed in file) *and Thomsen,* 198 F.3d at 1027–28 (not disciplinary and not placed in file). *See also Power,* 226 F.3d at 820 (citing *Bart v. Telford,* 677 F.2d 622, 624 (7th Cir.1982)) (whether criticism is likely to deter is determined largely by context). Although the letter of direction defendant Stevens gave plaintiff contained criticism of plaintiff's comments at the June 15th meeting, defendant Stevens told plaintiff that the letter was not intended to be disciplinary and that it would not be placed in her personnel file. This mitigated whatever deterrent effect the criticism of her comments may have had. Although plaintiff thought that the letter was disciplinary, the standard is measured from the objective perspective of a person of ordinary firmness; the plaintiff's subjective beliefs are not determinative. *Pieczynski v. Duffy,* 875 F.2d 1331, 1333 (7th Cir.1989) (holding that harassment of employee for political beliefs is actionable "unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing [his] beliefs").

c. Annual performance evaluation

▮ Unlike the letter of direction, defendant Stevens's negative comments on plaintiff's annual evaluation were more critical than instructional and did become part of plaintiff's personnel file. By its title, a "letter of direction" suggests that its contents are intended to be instructional. By contrast, negative comments made in a performance review take on more force. Because defendants have not denied that plaintiff's speech was protected under the First Amendment, I must assume that defendant Stevens criticized her for engaging in protected speech in his remarks about plaintiff failing to present

the society in a positive light to the public. Although defendant Stevens's comments are limited to criticizing plaintiff's speech made during working time or after a decision had been made, these specific limitations are not relevant. The issue is whether defendant Stevens was critical of speech that was constitutionally protected. *Cf. Williams*, 342 F.3d at 782. Although a plaintiff must show that a defendant's actions were substantially or materially motivated by an intent to retaliate against speech, the plaintiff need not prove that the defendant subjectively believed the speech to be protected. *See id.* Knowledge of the law is presumed. *United States v. Bryza*, 522 F.2d 414, 423 (7th Cir.1975). The court of appeals has noted that it is difficult to see how an employee's right to engage in constitutionally protected speech is not infringed by criticism that is presumptively intended to prevent similar recurrences would not infringe an employee's right to engage in constitutionally protected speech. *Yoggerst*, 623 F.2d at 39. Because defendant Stevens's comments in the annual evaluation were critical of presumptively protected speech and became part of plaintiff's personnel file, they are sufficiently adverse to sustain plaintiff's retaliation claim.

d. Recommending layoff

 As a preliminary matter, defendants argue that plaintiff has not made out a claim of retaliation against defendant Stevens for recommending her position for layoff because she did not provide a specific factual allegation regarding this recommendation in her complaint. As noted above, plaintiff clearly identified the selection of her position for layoff as a retaliatory act by defendants, see Pl.'s Cpt. dkt. # 17, at ¶ 43. Although plaintiff did not allege specifically that defendant Stevens recommended her position for layoff, a pleader is permitted to rely on inferential allegations that are developed later through discovery. *Brownlee v. Conine*, 957 F.2d 353, 354 (7th Cir.1992). *See also Bartholet*, 953 F.2d at 1078; 2 *Moore's Federal Practice* § 804[1]. Plaintiff has submitted evidence that defendant Stevens recommended cutting the office of local history when he engaged in defendant Vogt's budget exercise.

 Defendants note correctly that a plaintiff may not prevail against someone who does not have decision making authority unless the final decision maker acts merely as a "cat's paw" or a rubber stamp. *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1100 (7th Cir.2001) and *Eiland v. Trinity Hospital*, 150 F.3d 747, 752–53 (7th Cir.1998). They argue that the board members were the ultimate decision makers in laying plaintiff off and not defendant Vogt or defendant Stevens and therefore, she cannot recover against them individually on this claim.

Although defendants state the status of the law correctly, their argument is erroneous. As noted above, a First Amendment retaliation claim may be based on any sufficiently adverse employment action. In her complaint, plaintiff identifies the retaliatory act on which her claim is based as "selection for layoff" and not the actual layoff itself. The *recommendations* of defendants Vogt and Stevens that plaintiff's position should be laid off are sufficiently adverse that plaintiff may recover for them, at least nominally, if she can show that defendants were substantially motivated by retaliatory animus in making them. *Hulbert*, 120 F.3d at 654 (recommendation to reclassify plaintiff's position to a grade with lower salary was basis for liability even though county board was free to accept or reject recommendation); *DeGuiseppe*, 68 F.3d at 192 (discontinued employment clearly materially adverse). *See also Nelms v. Modisett*, 153 F.3d 815, 819 (7th Cir.1998) (person recommending

termination regarded as primary decision maker). Undisputedly, defendants Vogt and Stevens had the decision making authority to make their own recommendations.

█ The actions of the board in approving the recommendation to cut plaintiff's position are relevant to plaintiff's First Amendment claim only with respect to the extent of her potential recoverable damages. Plaintiff may recover only those damages caused by defendants' wrongful acts. This is because § 1983 is a tort statute, *Button v. Harden*, 814 F.2d 382, 383 (7th Cir.1987), and a plaintiff may recover in tort for only those injuries that a defendants' act proximately caused, *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1257 (7th Cir.1990). In this case, for example, plaintiff may not recover the backpay she seeks unless she can show a causal nexus between the recommendation of defendant Vogt or defendant Stevens and her actual layoff. In some instances, independent intervening acts may break a chain of causation. *United States v. Liss*, 103 F.3d 617, 621–22 (7th Cir. 1997). At most, the actions of the board may prevent plaintiff from recovering the full extent of the damages she seeks; they do not shield defendants Vogt and Stevens from all potential liability.

e. Campaign of petty harassment

█ Although I conclude that the enhanced scrutiny of plaintiff's work and the letter of direction are not sufficiently adverse individually, plaintiff may present evidence of either at trial pursuant to a theory that they form a campaign of petty harassment. *Bart*, 677 F.2d at 625. Plaintiff did not delineate each individual alleged retaliatory claim in a discrete claim but instead joined the acts together. "[A]n entire campaign of harassment which though trivial in detail may have been substantial in gross." *Id.* Plaintiff

may be entitled to recover for these acts if the jury concludes that defendant Stevens's actions formed a campaign of retaliatory conduct. *Id.; Walsh v. Ward*, 991 F.2d 1344, 1345 (7th Cir.1993). In addition, plaintiff may rely on either or both as evidence of defendants' retaliatory motive.

f. Failure to rehire

█ Although the parties do not debate the issue, I note that a failure to rehire is a sufficiently adverse act to support a First Amendment retaliation claim. *E.g., Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 283–284, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (plaintiff has claim "if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms").

3. *Substantial or motivating factor*

a. Speech unknown to defendants.

█ A reasonable jury could not conclude that a defendant's acts were substantially or materially motivated by speech of which he was not aware. *E.g., Patton v. Indianapolis Public School Board*, 276 F.3d 334, 340 (7th Cir.2002) (defendant granted summary judgment where plaintiff produced no evidence that defendant knew of protected speech); *O'Connor v. Chicago Transit Authority*, 985 F.2d 1362, 1370 (7th Cir.1993) (same). Defendants argue that they cannot be held liable for retaliating against plaintiff for her speech to state auditors in August of 2001 because neither defendant Vogt nor defendant Stevens knew that she had had this conversation until the complaint was filed.

Plaintiff attempts to impeach the deposition testimony of defendants Vogt and Stevens with circumstantial evidence. She suggests that it is likely that defendants suspected that she had spoken to the audi-

tor because they should have suspected that someone contacted the auditor with concerns when the audit continued past the anticipated date of completion and additional documents were requested. Additionally, she argues that defendants would have suspected plaintiff because they knew that she had criticized the society's accounting practices in the past.

 "[T]he testimony of credible witnesses concerning a matter within their knowledge cannot be rejected without some impeachment, contradiction or inconsistency with other evidence on the particular point at issue." *Selle v. Gibb*, 741 F.2d 896, 903 (7th Cir.1984). Speculation is insufficient. *Id.See also Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir.1988) ("A motion for summary judgment cannot be defeated by an opposing part's incantation of lack of credibility over a movant's supporting affidavit.") The inferences plaintiff attempts to rely on to impeach the credibility of defendants Vogt and Stevens are too attenuated and speculative. Plaintiff has not argued or adduced any evidence suggesting that an elongation of an audit would be unlikely unless an employee had divulged information that normally would not surface in the audit process. Further, it is of little probative weight that plaintiff had questioned the wisdom of the society's allocation of funds in the past unless there is evidence that she was the only employee that ever criticize the society. Even if I were to assume that defendants Vogt and Stevens suspected that one of the staff had spoken to the auditor, there is little reason to infer that they suspected plaintiff.

From the evidence plaintiff has adduced, a reasonable jury could not conclude that defendant Vogt or defendant Stevens knew about plaintiff's meeting with the state auditor. Therefore, their motion will be granted with respect to plaintiff's claim

that they retaliated against her for her comments to the auditor.

b. Subsequent speech

 Speech made after an act cannot be said to have caused that act. *Nieves v. Board of Education*, 297 F.3d 690, 693–94 (7th Cir.2002) (defendant entitled to summary judgment where unrebutted evidence shows plaintiff's position selected for layoff before plaintiff's speech). Defendants argue that plaintiff's speech at the February 26, 2002 staff meeting (and by implication, any speech thereafter) could not have substantially or materially motivated defendant Vogt because he had decided to recommend plaintiff's position for layoff before this date. Although plaintiff denies in her response brief that defendant Vogt had finished his recommendation decisions at this time, she did not dispute defendants' proposed finding of fact number 40, in which defendants stated that "[b]y this time [the February 26, 2002 meeting], Vogt had finalized his plans regarding which positions to eliminate." *See* Plt.'s Resp. to Defs.' PFOF, at 8.

 Nonetheless, defendants' argument is premised on their interpretation of the complaint as not making out a claim that defendant Vogt retaliated against plaintiff by refusing to rehire her when private funding became available. For the reasons already stated, I conclude that the complaint does make out this claim. In addition, plaintiff has adduced evidence that defendant Vogt acted to insure that the layoffs he had recommended were implemented by recommending that the at-risk employees not be allowed to petition the board to reconsider its decision. As noted above, retaliation may not always come in the form of a single discrete act; it may be based on a campaign of related activity. *Bart*, 677 F.2d at 625. Accordingly, defendants will not be granted sum-

mary judgment with respect to plaintiff's claim that she was retaliated against for her speech at the February 26, 2002 staff meeting.

### c. Temporal proximity

 It is well established that a plaintiff cannot establish retaliation simply by showing that the protected activity happened before the defendants took their action. *See, e.g., Sitar v. Indiana Dept. of Transportation,* 344 F.3d 720, 728 (7th Cir.2003) (noting that one event's following closely upon another is not dispositive in proving that the first act caused the second). *See also Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640, 642 (7th Cir.2002) ("mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue"). Conversely, long time gaps do not necessarily doom a retaliation claim. At least one district court has found that a three year gap did not support dismissal of an action. *Kiser v. Naperville Community Unit,* 227 F.Supp.2d 954, 971 (N.D.Ill.2002).

Although temporal proximity is rarely dispositive, it can be evidence that the speech played a role in a decision. Short time gaps support claims of causation, *Sitar,* 344 F.3d at 728; *McGuire v. City of Springfield, Illinois,* 280 F.3d 794, 796 (7th Cir.2002), while long time periods have the opposite effect. *Rakovich v. Wade,* 850 F.2d 1180, 1191 (7th Cir.1988) (long time gaps undercut other evidence of causation). Taken together, these cases show that timing should not be viewed in isolation; it can be more or less probative depending on the facts of each case.

Defendants argue that plaintiff will be unable to succeed on her claim that defendant Vogt retaliated against her for her comments about the society name change

in April and June of 2001 by recommending her position for layoff because there was a seven to nine-month time gap between the speech and the alleged retaliatory act. Defendants note correctly that absent any other evidence suggesting causation, a time gap of this length is too long to support a reasonable inference of causation. *Wallscetti v. Fox,* 258 F.3d 662, 669 (7th Cir.2001) (four-month gap with no other evidence of causation insufficient).

 However, plaintiff does not rely on sequence alone to show causation. She has adduced evidence showing that defendant Vogt objected to her comments about the name change and that he wished to diminish her public appearances because of them. Specifically, she has shown that defendant Vogt directed defendant Stevens to talk to plaintiff about the comments she made that were published in *The Capital Times,* that he expressed contempt for these comments at the June 15, 2001 board of curators meeting, and that he wrote a latter dated July 3, 2001, recommending that plaintiff be removed as a co-host of "Wisconsin Stories" because of them. A pattern of criticism and animosity may establish a causal link between protected activity and a defendant's adverse act, particularly when the criticism follows close on the heels of the protected speech. *Hunt–Golliday v. Metropolitan Water Reclamation District of Greater Chicago,* 104 F.3d 1004, 1014–15 (7th Cir. 1997). In *Hunt–Golliday,* the court held that criticism of plaintiff's work performance immediately following her protected activity provided a causal link. *Id.* at 1015. The causal link suggested by plaintiff's evidence is even stronger in this case because defendant Vogt's criticism is directed at plaintiff's presumptively protected speech. Because a reasonable jury could conclude in light of this evidence that plaintiff's comments about the society

name change was a motivating factor for defendant Vogt's decision to recommend her position for layoff, defendants' motion will be denied with respect to this claim.

d. Similarly situated employees

■ Defendants argue that plaintiff's First Amendment claim must fail because she has not produced any evidence of similarly situated employees who did not engage in protected speech and were treated more favorably. This argument is unavailing. Proof of similarly situated employees is an element of the prima facie case under the burden shifting method of proof developed for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court of Appeals for the Seventh Circuit has never applied this framework in the First Amendment retaliation context. Even if the *McDonnell Douglas* framework were to apply in this context, it is only one method of proving a claim. *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir.2002). Alternately, plaintiff may rely on either direct evidence, which essentially is an admission of retaliatory intent, or other forms of circumstantial evidence, such as "suspicious timing, ambiguous statements oral or written ... and other ·bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994).

4. *Mt. Healthy affirmative defense*

■ Even if plaintiff is able to prove that her protected speech was a substantial or motivating factor for defendants' adverse acts, she will not be able to recover if defendants can show that they would have taken the same action anyway. *Vukadinovich v. Board of School Trustees*, 278 F.3d 693, 699 (7th Cir.2002); *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568. Of course, defendants bear this burden only

because plaintiff has first met her heavy burden by adducing evidence showing that her protected activity was a substantial or motivating factor for defendants' acts. *Vukadinovich*, 278 F.3d at 699. When the party moving for summary judgment bears the burden of persuasion on an element, the moving party cannot prevail without establishing that element as a matter of law; it is not enough to show that a jury could conclude reasonably in favor of the movant. *See Liberty Lobby*, 477 U.S. at 250–53, 106 S.Ct. 2505 (substantive burden of proof incorporated into summary judgment analysis); *Edison v. Reliable Life Insurance Co.*, 664 F.2d 1130, 1131 (9th Cir.1981); 11 *Moore's Federal Practice* § 5613[1].

■ Plaintiff may call defendants' proffered justifications into question by showing that they are pretextual. *Vukadinovich*, 278 F.3d at 699. To show pretext, plaintiff may demonstrate that defendants' justifications have no basis in fact, are not the real reason for the adverse act or are insufficient to justify the adverse act. *Id.*

Defendants argue that defendant Vogt would have recommended plaintiff's position for layoff absent any retaliatory motive because "fiscal constraints ... necessitated [defendant] Vogt recommending that persons holding positions more critical to the Society mission than the position held by [plaintiff] be laid off in that same reduction-in-force cycle." Dfts.' Br. in Supp. Mot. for Summ. J., dkt # 20 at 14. (Defendants have not asserted a *Mt. Healthy* affirmative defense with respect to any other aspect of plaintiff's claim.) Defendants have not met the heavy burden they face. They have not proved that the layoffs were a financial necessity and even if they had, they have not shown that plaintiff's position would have been selected.

The first prong of defendants' argument is that fiscal constraints necessitated the layoff of plaintiff's position. Defendants have shown that significant cuts were made to the society's budget but their proposed findings of fact fail to prove that the layoffs were necessary. To succeed on their fiscal constraints theory on summary judgment, defendants need to show more than just a reasonable basis for the layoff; they must show that the layoffs were necessary. *See Wren v. Jones,* 635 F.2d 1277, 1286 (7th Cir.1980) ("defendants have, by a preponderance of the evidence, established that fiscal restraints *required* a reduction" in number of employees) (emphasis added).

Defendants challenge this legal standard. They rely on two cases under the Age Discrimination in Employment Act, *Pitasi v. Gartner Group, Inc.,* 184 F.3d 709, 718 (7th Cir.1999) and *Konowitz v. Schnadig Corp.,* 965 F.2d 230, 233 (7th Cir.1992), for the proposition that courts may not sit as super-personnel boards and second guess an employer's business judgment. Defendants' reliance on this rule is misplaced. First, these cases are distinguishable; the court admonished district courts not to second guess an employer's determination of which employees to lay off and not the employer's decision to lay off at least some employees. *Id.* Second, in both of these cases, the plaintiffs relied on the *McDonnell Douglas* burden shifting model under which the defendants bear only the burden of production, and not persuasion, to show that they had a legitimate and non-discriminatory basis for their actions. *Pitasi,* 184 F.3d at 716; *Konowitz,* 965 F.2d at 232. In contrast, defendants in a First Amendment retaliation claim must prove that their proffered non-discriminatory reason was the actual reason. *Rakovich,* 850 F.2d at 1189. When a defendant in a First Amendment case invokes a "fiscal restraint" explanation for its action, it must prove that it was actually fiscally restrained. Certainly, a large budget cut is a reasonable basis for laying off employees; however, this does not mean that any or all of the layoffs were necessary. Even when an employer has a compelling reason to lay off workers, the employer is not entitled to use the occasion to discriminate. *Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1195 (7th Cir.1997). Finally, in determining whether layoffs were financially necessary, a court determines only whether the employer had discretion or not; it does not determine how well that discretion was used.

Even if I were to assume that some layoffs were necessary to compensate for the loss in funding, defendants have not proved that they would have selected plaintiff's position absent her speech. "Comparative considerations are particularly important in the context of a bona fide RIF, because the employer must decide which qualified workers to retain." *Matthews,* 128 F.3d at 1196. Defendants relied on the following priorities: (1) spreading cuts throughout the society; (2) maintaining support funding (such as funds for supplies, services and term employees); (3) preserving museum funding; (4) cutting low priority vacancies first; and (5) preserving programs with the largest and most diverse audiences. However, they have not adduced any evidence to show that these factors were implemented. In other words, there is no evidence that cuts were spread throughout the society, that support and museum funding were left largely intact, low priority vacancies were cut first or that programs with the largest and most diverse audiences were given priority. A general and somewhat contradictory list of priorities leaves too much room for discretionary application to prove that plaintiff's position would have been selected absent any retaliatory motive.

Even if defendants' neutral application of these factors led them to conclude that they should cut one of the two positions in the office of local history, defendants have not provided any explanation for choosing plaintiff's position. Defendants state only that they did not recommend that both positions in the office of local history be cut because they hoped that if the programs remained in place, they might be able to rebuild them in the future. They do not indicate why McKay was better suited to keep the office running or why his position was pivotal to the society. *Cf. Nelms,* 153 F.3d at 821–22 (in determining which of two employees to lay off, employer relied on duration of employment, performance, skills and professionalism). Although defendants note that McKay was also critical of defendant Vogt and his policies, they have not proposed any facts to support this assertion. Further, there is no evidence that McKay criticized defendant Vogt as vigorously or as publicly as plaintiff. Absent such evidence, there is no basis for concluding that defendants would have selected plaintiff's position instead of McKay's had they not had any retaliatory motive.

5. *Official capacity claims*

▆▆ Plaintiff has sued the current director of the board of curators and defendant Stevens in their official capacities. Generally, the Eleventh Amendment bars suits against state employees acting in their official capacity. *Marie O. v. Edgar,* 131 F.3d 610, 615 (7th Cir.1997). An exception to this rule exists if the plaintiff seeks prospective injunctive relief against the state official. *Id.; Ex parte Young,* 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908). However, this exception applies only when the state official has the authority to perform the requested act. *Adler v. Pataki,* 204 F.Supp.2d 384, 390 (N.D.N.Y.2002). Plaintiff sought two specific forms of injunctive relief: (1) rein-

statement; and (2) expungement of defendant Steven's letter of direction of June 19, 2002 from plaintiff's personnel file. Defendants argue that the letter of direction was never placed in plaintiff's personnel file and that neither of the defendants sued in their official capacity has the authority to reinstate plaintiff because the position for which she seeks reinstatement no longer exists. Because neither the director or defendant Stevens has the power to give plaintiff the injunctive relief she seeks, defendants argue, they should be entitled to summary judgment on plaintiff's official capacity claims. Plaintiff does not deny that the letter was never placed in her file, making expungement unnecessary and impossible. She does challenge defendants' claim that they have no authority to reinstate her.

First, plaintiff cites defendant Vogt's statement that he wanted to maintain one position in the office of local history so that it would be possible to rebuild the office in the future and extrapolates from this statement the conclusion that defendants must have the authority to reestablish her old position. This argument stretches defendant Vogt's statement too far. Even if it were true that defendants had the collective power to reestablish plaintiff's position, this does not mean that either defendant Stevens or the director has this authority. Moreover, as plaintiff herself notes, board or legislative approval may be required for the creation of new positions. Plaintiff argues also that defendants could convert a vacant position into a second position in the office of local history and cites evidence purporting to show that the society has done so in the past. Again, the inquiry is limited to the authority of the director or defendant Stevens to convert vacant positions. Plaintiff has neither argued that these defendants have this power nor adduced any evidence to show that they do.

■ Plaintiff notes that in addition to the specific injunctive relief she has requested, she is seeking sought any other relief that the court deems just and equitable. She suggests that even if there are certain procedural hurdles, the court could order that the director and defendant Stevens "get the process started" as a form of just and equitable relief. When a party seeks any relief that the court deems just and equitable, a court may grant injunctive relief that the plaintiff did not request specifically. *Felce v. Fiedler,* 974 F.2d 1484, 1501 (7th Cir.1992). Because it is unclear from the record what "procedural hurdles" there may be in reinstating plaintiff's former position, I will reserve judgment on what additional injunctive relief may be warranted. However, plaintiff will be granted injunctive relief only if she adduces sufficient evidence at trial to enable the court to describe the terms of the injunction with the specificity required in Fed.R.Civ.P. 65(d). Plaintiff must show what acts of the director or defendant Stevens would "get the process started" and that these defendants have the authority in their official capacity to undertake these acts.

### 6. *Entitlement to qualified immunity*

■ Government officials performing discretionary functions are entitled to protection under the doctrine of qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). *See also Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity represents an accommodation of the conflicting concerns of providing remedies for persons injured as a result of a public official's abuse of his office, thus vindicating constitutional guarantees, and insuring that "fear of personal monetary liability and harassing litigation" does not unduly inhibit officials in the discharge of their duties. *Anderson,* 483 U.S. at 638, 107 S.Ct. 3034.

In their brief in support of their motion for summary judgement, defendants lay out the legal standards governing qualified immunity and assert a general entitlement to the doctrine's protection. Defendants argue that because plaintiff bears the burden of showing that defendants are not entitled to qualified immunity, it is sufficient for them merely to raise the issue. Plaintiff objects to defendants' lack of specificity, arguing that defendants have not even identified the claims for which they are seeking this protection. Some courts have held that similar cursory assertions of entitlement to qualified immunity are insufficient to raise the issue. *E.g. Malec v. Sanford,* 191 F.R.D. 581, 586 n. 2 (N.D.Ill.2000) ("In fact, the defendants wrongly place the burden on [plaintiff] to establish that they are not entitled to qualified immunity. Ultimately, he might have had to bear that burden, but not until they first demonstrated entitlement to that protection.") On the other hand, the purpose of this doctrine is not just to immunize public officials against liability for civil damages but to protect them from the burdens of litigation. *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). However, I need not resolve this dispute because I conclude that defendants are not entitled to qualified immunity protection. Thus, it is immaterial whether they have raised the issue properly or not.

The first step in the qualified immunity analysis is to determine that "plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). I have already performed this analysis in

the discussion above. To summarize, plaintiff identified four acts of speech in her complaint and I concluded that all four satisfied the *Connick–Pickering* standard for the purpose of summary judgment. With respect to the retaliatory acts plaintiff alleges, I concluded that the negative comments on plaintiff's annual performance evaluation, identifying her position for layoff and failing to rehire her when funding for her position became available are sufficiently adverse acts. The letter of direction and the institution of weekly meetings are not sufficiently adverse standing alone but they may form part of a campaign of retaliatory conduct that would meet this standard. It is disputed whether defendants were substantially or materially motivated by plaintiff's protected speech. Because plaintiff is the non-moving party with respect to this claim, this factual dispute will be resolved in her favor. *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505 (on motion for summary judgment, all inferences are to be drawn in favor of non-moving party).

 The second step is to determine whether the constitutional right was clearly established at the time of the alleged injury. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151; *Payne v. Pauley,* 337 F.3d 767, 775 (7th Cir.2003). This requires consideration of the specific context of the case. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. A plaintiff may show that a right is clearly established by pointing to "closely analogous cases establishing that the conduct is unlawful, or demonstrate that the violation is so obvious that a reasonable state actor would know that what he [or she] is doing violates the Constitution." *Morrell v. Mock,* 270 F.3d 1090, 1100 (7th Cir.2001). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Hope,* 536 U.S. at 739, 122 S.Ct. 2508 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). Even if the constitutional right was clearly established at the time of the alleged injury, a public official may still be entitled to qualified immunity if he makes an objectively reasonable mistake about what the law requires. *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151.

"It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights." *Gustafson,* 117 F.3d at 1021. However, a defendant may be entitled to qualified immunity protection if he did not know in advance whether his actions were legal or forbidden either because the line between protected and nonprotected speech is in doubt, *see, e.g., Glass,* 2 F.3d 733, or because reasonable people would not realize that their response to the speech is an impermissible one, *see, e.g., Dahm v. Flynn,* 60 F.3d 253, 258–59 (7th Cir.1994). However, the legal principles governing this case are clear.

1. *Clearly established that speech was protected*

 It is well established that speech concerning improper handling of public funds is a matter of public concern. *Marshall,* 32 F.3d at 1219. When plaintiff spoke about the potential commingling of society and foundation funds, the fusion of the identities of the two and about defendant Vogt's salary increase, she was addressing the fiscal management by and of a public entity. Moreover, plaintiff has almost no personal incentive to speak out on these issues. *Gustafson,* 290 F.3d at 907 (lack of personal interest is indicator of public concern).

 In speaking about removal of the word "state" from the society's name, plaintiff was questioning the soundness of

decision making processes within a state agency. "Speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." *Wainscott*, 315 F.3d at 849 (quoting *Conaway v. Smith*, 853 F.2d 789, 797 (10th Cir.1988)). In addition, plaintiff addressed the issue of continuing public control over a state owned agency. One mission of the First Amendment is "securing meaningful public control over the process of governance." *Press–Enterprise Co. v. Superior Court of California, Riverside County*, 464 U.S. 501, 519, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (Stevens, J., concurring). Finally, the fact that these comments were printed in a newspaper and contained no trace of self-interest eliminates any lingering doubt that these statements addressed a matter of public concern. *Zorzi*, 30 F.3d at 896–97 n. 11 (publication in newspaper indicates matter of public concern).

In certain circumstances, a public employee's speech will not be entitled to constitutional protection even if it does address a matter of public concern, if the employer has a legitimate interest that outweighs the employee's interest in the speech. *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. In this case, the evidence suggests that defendants may have believed that plaintiff's speech was not protected because it was made on work time, *e.g.*, *Glass*, 2 F.3d 733 (legitimate concerns about channels of communication and manner of reporting might entitle employer to qualified immunity for adverse employment action taken in response to reporting of suspected wrongdoing), after a final decision, *see, e.g.*, *Vargas Harrison v. Racine Unified School District*, 272 F.3d 964 (7th Cir.2001) (policy making employees may not criticize settled policies), or because it was disruptive of the society's operations, *see, e.g. Williams*, 342 F.3d at 783–84 (need for discipline within police department); *Gustafson*, 290 F.3d 895. However-

er, I cannot make any determination of the reasonableness of this reliance at this stage of the proceedings. Although it is defendants' burden to show that they had a legitimate governmental interest that outweighed plaintiff's interest in the speech, *Wainscott*, 315 F.3d at 851, defendants did not identify any governmental interest on which they may have been relying.

### 2. Clearly established that defendants' acts were sufficiently adverse

Further, defendants' actions were well established as sufficiently adverse at the time defendants took them. It was well established that a negative review of an employee's performance is an impermissible reaction to protected speech if the review is placed in the employee's personnel file. *Yoggerst*, 623 F.2d at 39. Further, eliminating an employee's position is an impermissible reaction. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 73, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (layoff is sufficiently adverse act because it could cause employee to discontinue engaging in her protected First Amendment rights); *Cromley v. Board of Education of Lockport Township High School District 205*, 17 F.3d 1059, 1067 (7th Cir.1994) (elimination of position through departmental merger). Although the board made the final decision to eliminate plaintiff's position, it was well established that the recommendation of an actionable adverse act is sufficiently adverse also. *Egger v. Phillips*, 710 F.2d 292, 294 (7th Cir.1983), *overruled in part on other grounds, Feit v. Ward*, 886 F.2d 848, 849 (7th Cir.1989). Finally, analogous cases made it clear that a public employer is not entitled to refuse to reinstate an employee because of her protected speech. *Rutan v. Republican Party of Illinois*, 848 F.2d 1396, 1410 (7th Cir.1988), *rev'd in part on other grounds*, 497 U.S. 62, 110 S.Ct. 2729,

111 L.Ed.2d 52 (1990) ("a layoff will typically involve some formal or informal expectation of being placed back in the position if, within some specified or reasonable time period, the job becomes open once again.")

Because all aspects of plaintiff's claims were clearly established at the time defendants acted, they are not entitled to qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151; *Payne,* 337 F.3d at 775.

### C. *Wis. Stat. § 895.65 Claims*

■ Wis. Stat. § 895.65 is one of Wisconsin's "whistleblower" provisions, prohibiting state employers from disciplining their employees for disclosing certain information. It provides certain public employees with a cause of action "against his or her employer or employer's agent, including this state, if the employer or employer's agent retaliates, by engaging in a *disciplinary action* against the employee because the employee exercised his or her rights under the first amendment to the U.S. constitution or article I, section 3, of the Wisconsin constitution by lawfully *disclosing information* or because the employer or employer's agent believes the employee so exercised his or her rights." Wis. Stat. § 895.65(2) (emphasis added).

Defendants argue that plaintiff cannot succeed on her claim under this statute because she has not adduced any information to show that they knew that she had spoken to state auditors about her concerns over the society's fiscal management. For the reasons stated above, I conclude that plaintiff has not made this showing and that defendants could not have retaliated against her because of this conversation.

■ However, plaintiff asserts that her claim under Wis. Stat. § 895.65 was not based solely on her communications to state auditors but was also supported by her comments about the name change, the merging of identities of the foundation and the society and defendant Vogt's salary increase. The parties present extensive arguments regarding whether these comments qualify as "information" and whether any of defendants' actions would qualify as a "disciplinary action" as these terms are defined in the statute. However, I do not need to address these arguments. None of plaintiff's comments are disclosures, other than those she made to the state auditor.

The scope of an employee's protection under Wis. Stat. § 895.65 is narrower than the protection afforded by the First Amendment. *Hutson v. State of Wisconsin Personnel Comm.,* 2003 WI 97, ¶ 37, 263 Wis.2d 612, 665 N.W.2d 212 (although Wisconsin's whistle blower statutes are to be liberally construed, "only certain disclosures made a particular way and regarding a subject matter covered in the statute will qualify for protection"). *See also* Wis. Stat. § 895.65(2) (requiring violation of employee's First Amendment or state constitutional rights in order to find violation of the statute).

Although the provision does not include a definition of a "disclosure" and there is no case law interpreting Wis. Stat. § 895.65, or its companion whistle blowing provision, Wis. Stat. § 230 .83, courts are to give words their ordinary meaning when interpreting the meaning of a statute. *State v. Peters,* 2003 WI 88, ¶ 14, 263 Wis.2d 475, 665 N.W.2d 171. A court may use a dictionary to determine a word's ordinary meaning. *E.g., id.* at ¶ 2, 263 Wis.2d 475, 665 N.W.2d 171. A disclosure is "the action of making new secret information known." *The New Oxford American Dictionary* 486 (2001). Except for her discussion with the auditors, plaintiff did not make "secret information known." Instead, she gave her opinions and views regarding information that was already known.

At best, plaintiff could argue that by asking defendant Vogt whether he was negotiating a salary increase, she was "disclosing" these negotiations. Even if I were to consider this pointed inquiry to be a disclosure, the statute protects only those employees who have disclosed a "substantial waste of public funds." Wis. Stat. § 895.65(1)(d). Plaintiff did not disclose an actual salary increase but instead disclosed negotiations for one. It is reasonable to assume from defendant Vogt's resignation approximately one month later that the raise was denied.

Because plaintiff's statements are not "disclosures," plaintiff is not entitled to protection under Wis. Stat. § 895.65. Thus, defendants' motion for summary judgment will be granted with respect to this claim.

### ORDER

1. Defendants' motion to exclude the Feller affidavit is DENIED. Plaintiff has timely cured any foundational inadequacies.

2. Defendants' motion for summary judgment is GRANTED with respect to plaintiff's claims under Wis. Stat. § 895.65 because plaintiff has failed to show that she made a disclosure entitling her to statutory protection. Plaintiff's complaint is DISMISSED with respect to defendants State Historical Society and Board of Curators of the State Historical Society of Wisconsin.

3. Defendants' motion for summary judgment is GRANTED with respect to plaintiff's claim that defendants Vogt, Stevens and the current director retaliated against her for discussing her concerns about fiscal mismanagement within the society to state auditors because she has not adduced evidence from which a jury could conclude reasonably that defendants knew about this meeting before they took any allegedly retaliatory actions.

4. Defendants' motion for summary judgment is GRANTED with respect to plaintiff's claim that defendant Stevens retaliated against her by instituting monthly meetings and giving her a letter of direction because these acts are not sufficiently adverse to support a First Amendment retaliation claim.

5. Defendants' motion for summary judgment is DENIED with respect to plaintiff's claim that defendants Vogt, Stevens and the current director retaliated against her by recommending her position for layoff because of her comments about the society name change, fusing of the identities of the society and the foundation and defendant Vogt's negotiated salary increase.

6. Defendants' motion for summary judgment is DENIED with respect to plaintiff's claim that Vogt, Stevens and the current director retaliated against her by refusing to rehire her when private funding became available because of her comments about the society name change, fusing of the identities of the society and the foundation and defendant Vogt's negotiated salary increase.

7. Defendants' motion for summary judgment is DENIED with respect to plaintiff's claim that defendant Stevens retaliated against her by making negative remarks on her annual performance evaluation because of her comments about the society name change, fusing of the identities of the society and the foundation and defendant Vogt's negotiated salary increase.

8. Defendants' motion for summary judgment is DENIED with respect to plaintiff's claim that defendant Stevens retaliated against her with a campaign of petty harassment because of her statements about the society name change, fusing of the identities of the society and the

foundation and defendant Vogt's negotiated salary increase.